[No. 13487. Department One. February 17, 1917.]

## A. L. ALLEN, *Appellant*, v. THE CITY OF BELLINGHAM et al., *Respondents.*[1]

CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—CLASS LEGISLATION—CARRIERS—JITNEY BUSSES—REGULATION. An ordinance regulating jitney busses in a city does not deny the equal protection of the laws or deny to persons privileges and immunities which upon the same terms belong to other persons, in violation of the state and Federal constitutions, in that its provisions are not made applicable to auto stages, sightseeing automobiles, taxicabs, horse stages, street cars, and other carriers transporting passengers for hire; since the business of jitney busses differs from all these and the effect of the constitutional limitations merely is to prohibit arbitrary and unreasonable classifications, and require only that the regulations operate alike upon all those similarly affected.

SAME. Such an ordinance is not invalid or unconstitutional because it provides penalties for the violation of its regulative provisions, nor because others, not in the same situation, may lawfully do what is prohibited to the jitney bus owner.

MUNICIPAL CORPORATIONS—ORDINANCES—REGULATION OF MOTOR VEHICLES—STATUTES. Municipal regulation of jitney busses is not precluded by Rem. Code, § 5562-1 *et seq.*, requiring persons operating passenger motor vehicles for hire in cities of the first class to pay a fee, obtain a license, and give a bond to secure damages sustained by any person through negligent operation, the only limitation upon cities being § 5562-34, providing that local authorities shall not require any license other than a license or occupation tax or exclude

[1]Reported in 163 Pac. 18.

any owner from the free use of the streets except as provided in the act, provided, however, that nothing in the act shall exclude local authorities from making and enforcing ordinances, rules and regulations governing traffic in addition to the provisions of the act.

SAME. Municipal police regulations and revenue measures within the limits of a city are not precluded by Rem. Code, § 5562-37 *et seq.* requiring all owners of motor propelled vehicles used in public highways to procure a license, carry number plates and safety devices and observe certain laws of the road, the act being intended only as general state regulation subject to additional local legislation not inconsistent therewith; especially in view of Const., art. 11, § 11, declaring that any county or city may make or enforce within its limits such local, police, and other regulations as are not in conflict with general laws.

LICENSES—"OCCUPATION TAX"—JITNEY BUS ORDINANCE. An ordinance which requires the owner of each jitney bus to pay the sum of $5 for each passenger seat capacity and $4 for each driver's permit exacts a license or occupation tax, within the meaning of Rem. Code, § 5562-34, prohibiting licenses other than an occupation license or tax.

SAME — OCCUPATION TAX — DISCRIMINATION — JITNEY BUS ORDINANCE. Such an ordinance is not discriminatory in not exacting any tax from motor propelled vehicles other than jitney busses, since that business is distinct and one business may be taxed while others are not.

MUNICIPAL CORPORATIONS—ORDINANCES—OPERATION OF MOTOR VEHICLES. A municipal occupation or license tax upon the operation of jitney busses is authorized by Rem. Code, § 5563-34, providing that owners of motor propelled vehicles complying with the act shall not be excluded from the "free use of the streets," where the act further expressly permitted the exaction of an occupation or license tax and authorized the city to make rules and regulations governing traffic.

SAME. An ordinance requiring jitney busses to operate on fixed schedules over designated routes, and regulating places for stopping, the number of passengers carried, lights, and other matters, cannot be said to be inherently oppressive and unreasonable, but is within the power of the city as promoting the comfort and safety of the passengers.

Appeal from a judgment of the superior court for Whatcom county, Brawley, J., entered April 7, 1916, upon sustaining a demurrer to the complaint, dismissing an action to enjoin the enforcement of an ordinance regulating the operation of jitney busses, tried to the court. Affirmed.

*Hurlbut & Neal*, for appellant.

*Dan F. North, Newman & Kindall*, and *C. W. Howard*, for respondents.

FULLERTON, J.—This is an action brought by A. L. Allen against the city of Bellingham and others, seeking to enjoin the city named from enforcing, or attempting to enforce, an ordinance of the city regulating the carrying of passengers on its streets in motor propelled vehicles commonly known as jitney busses. A general demurrer to the complaint was interposed, which the trial court sustained. The plaintiff elected to stand on the complaint and refused to plead further, whereupon the court entered a judgment to the effect that the plaintiff take nothing by his action. From the judgment so entered, this appeal is prosecuted.

As the case is presented to this court, the sole question involved is the validity of the ordinance the enforcement of which is sought to be enjoined. The appellant attacks the ordinance, not only as a whole, but upon a number of its several provisions as well, and we have found it convenient, notwithstanding its considerable length, to set it forth in full. The ordinance is as follows:

"Ordinance No. 2543.

"An Ordinance of the city of Bellingham relating to and regulating common carriers of passengers upon public streets in motor propelled vehicles herein defined as jitney busses; defining the meaning of the term 'Jitney Bus' providing for the licensing of the same as well as for the licensing of the drivers thereof; prescribing prohibitions and regulations pertaining to the operation and driving of jitney busses; providing for schedules and routes of operations; providing for terminating existing licenses; and prescribing penalties for the violation of any of the provisions of this ordinance.

"The City of Bellingham does ordain:

"Section 1. Definitions. Unless it appears from the context that a different meaning is given, the following words shall have the meaning given to them by this section.

"The word 'street' shall mean and include any street, boulevard, avenue, alley, court, lane, or public place, in the city of Bellingham.

"The word 'person' shall mean and include an individual, a firm, a copartnership, a corporation, company, association, or joint stock association.

"The word 'owner' shall mean and include the 'person' (as such word is defined in this section) making application for and to whom may be granted a jitney bus license hereunder.

"The words 'jitney bus license' shall mean a license issued to the owner authorizing the particular motor vehicle described therein to be used as a 'jitney bus' upon the particular route and schedule described in the identification card issued for such jitney bus, subject to the provisions of this ordinance.

"The words 'driver's permit' shall mean a permit authorizing the person to whom it is issued to drive upon its particular route any licensed jitney bus of which he may be the owner or authorized agent or employee of the owner, subject to the provisions of this ordinance.

"The words 'jitney bus' shall mean and include every motor propelled vehicle not operated on tracks, used in the occupation of carrying persons for hire, operating on any street for the purpose of affording a means of transportation along any street similar to that ordinarily afforded by street railways, by indiscriminately accepting and discharging within the limits of the city such persons as may offer themselves for transportation for hire along the way, or course, on which such vehicle is used, or operated, or may be running.

"Section 2. From and after the taking effect of this ordinance, it shall be unlawful to operate or drive a jitney bus except upon compliance with the provisions of this ordinance. The person making application for a license to operate, or have operated, hereunder, a jitney bus shall, for the purposes of this ordinance, be deemed the owner of such jitney bus, but nothing in this ordinance contained shall be construed to impose upon such owner the duty of driving such jitney bus in person. Provided, that neither the owner, his agent or employees, shall be authorized to drive a jitney bus at any time unless the person driving such jitney bus shall be the holder of a driver's permit as herein provided,

and provided further, that the duty of maintaining the schedule herein provided for shall be incumbent upon the owner, and for that purpose it shall be his duty to employ and keep employed such number of agents and employees as may be reasonably necessary for the maintenance of such schedule.

"Section 3. Licenses required hereunder are of two kinds: —(a) one for each jitney bus, (b) one each for each of the drivers thereof. The former shall be known as 'Bellingham, Wash. Jitney Bus License No. . . .' (inserting the serial number) and the latter shall be known as 'Bellingham, Wash. Driver's Permit No. . . .' For each jitney bus there shall be paid as an occupation license, or tax, the sum of five dollars per annum for each passenger seat capacity for each jitney bus. For each driver of a jitney bus there shall be paid as an occupation license, or tax, the sum of four dollars per annum for each driver's permit, and no jitney bus shall be driven by a person who shall not have first obtained a permit to drive the same as herein provided.

"Section 4. Application for a jitney bus license shall be made to the council of the city of Bellingham by filing the same with the city comptroller. Each such applicant shall state his name, age, place of residence, whether he has previously held a jitney bus license and, if so, where, kind of jitney bus for which license is desired, state or county license number, maker's name, manufacturer's vehicle number and motor number, maker's rated fixed seating capacity, or in each case where the seating capacity as manufactured by the original maker thereof has been reconstructed, or rebuilt, since leaving the factory, the fixed seating capacity as so rebuilt, the route or routes and the termini thereof for which a jitney bus license is desired, and the schedule proposed to be maintained, whether a bond issued and conditioned as provided by chapter 57 of the session laws of the state of Washington for the year 1915 has been filed with and approved by the secretary of state, and if so, giving the name and address of the principal and surety on such bond; which application shall contain upon its face the express agreement of the applicant to abide by, observe and perform each and every of the provisions of this ordinance incumbent upon him as such owner to perform; such application must be

signed and sworn to before a notary public, or some other officer duly authorized to administer oaths.

"Section 5.   Application for a driver's permit to drive a jitney bus shall be made to the council of the city of Bellingham by filing the same with the city comptroller.   Each such applicant shall state his name, age, place of birth, place of residence, length of time he has resided in the city, married or single, citizen or non-citizen, last place of employment, with name and address of employer, whether he has been previously licensed as a driver, and, if so, where, and whether or not his license has ever been suspended or revoked and, if so, for what cause, how long he has been engaged in driving an automobile; whether he is the owner of the jitney bus for which permit to drive is sought, and, if so, the number of the license issued therefor hereunder, or, if a license has not been issued, a reference to the application therefor sufficient to identify such application; if the applicant is not the owner of a jitney bus for which license hereunder has been issued or applied for, the name of the owner for whom he seeks permit to drive as agent or employee, giving the jitney bus license number issued hereunder, or where none has been issued, a reference to the application therefor sufficient to identify such application.

"Section 6.   Each applicant for a driver's permit must possess the following qualifications:   He must be at least eighteen years of age.   He must submit to a medical examination by the city health officer and procure from him and file with his application a certificate showing that he is free from any infirmity of body or mind which would render him unfit for the safe operation of a jitney bus, and especially such applicant shall be free from any taint of or tendency to epilepsy, vertigo, heart trouble, or color blindness.   He must be able to speak the English language.   He must not be addicted to the use of intoxicating liquors, opium, or any of its alkaloids.   His application must be signed and sworn to before a notary public, or some other officer duly authorized to administer oaths.   Each such application must be accompanied with two recent photographs of the applicant of a size which may be easily attached to his identification card, one of which photographs shall be attached to such identification card when permit is issued and the other to be filed with the city comptroller.   The photograph of the licensee

shall be so attached to the identification card that it cannot be removed and another photograph substituted without detection.

"Section 7.    A driver's permit shall not be issued to drive a jitney bus until the jitney bus so to be driven shall have been licensed in accordance herewith, and upon the expiration or revocation of any jitney bus license the driver's permit therefor as to such jitney bus shall *ipso facto* terminate.

"Section 8.    Every application for a jitney bus license shall be accompanied by a certified check payable to the order of the city treasurer for the annual license tax on such jitney bus for the ensuing year, and every application for a driver's permit shall be accompanied by a like certified check for the amount of the annual driver's license tax for the ensuing year.

"Section 9.    No application for either a jitney bus license or a driver's permit shall be granted unless it contains upon its face the express agreement of the applicant to abide by, observe and perform each and every of the provisions of this ordinance incumbent upon him to perform, and that for a failure so to do the council may revoke such license, or permit, as the case may be.    In case application for jitney bus license is denied, the certified check accompanying such application shall be returned to the applicant, and in case application for driver's permit is denied, the certified check and photographs accompanying such application shall be returned to the applicant.    Provided, however, that the application of one seeking a driver's permit to drive a jitney bus as an agent or employee of another shall be accompanied with the written appointment of the owner designating such applicant as his agent or employee, with authority to drive the particular jitney bus for which license has been, or may be, issued to such owner, and therein agreeing that the applicant is the agent or employee of such owner within the meaning of chapter 57 of the session laws of the state of Washington for the year 1915, and that he will in all respects be bound by the acts of the applicant as his agent or employee.    Provided further, that in the event of a driver's permit being issued to an applicant as the agent or employee of any particular jitney bus owner the permit to drive such jitney bus shall cease, terminate and become revoked twenty-four hours subsequent to the filing by such owner of a revo-

cation of the authority of such agent to act as his agent or employee in the operation of the particular jitney bus mentioned in such revocation, which shall be executed by him in writing in duplicate, and one copy filed with the city comptroller and simultaneously therewith one copy filed with the chief of police. Thereupon, it shall be the duty of the comptroller to revoke such driver's permit for the operation of the jitney bus so authorized by such license, and it shall be the duty of the chief of police to immediately notify the holder of such permit of such revocation, and it shall be unlawful for such agent or employee, upon receiving notice of such revocation, to thereafter operate such jitney bus until a new driver's permit shall have been obtained therefor.

"Section 10. Each application for a driver's permit shall be by the city comptroller immediately transferred to the chief of police, who shall make an examination as to whether the applicant possesses the qualifications prescribed by this ordinance and is worthy, capable and properly qualified by experience to drive such jitney bus, and he shall, as soon as such examination shall have been completed (which shall be without delay), return such application with his report thereon to the city council.

"Section 11. If from such report, or independent thereof, the council finds that such application for driver's permit is in accordance with the provisions of this ordinance and should be granted, it shall grant the same. If the council finds that the applicant for such driver's permit does not possess the qualifications to drive a jitney bus as prescribed by this ordinance, or that his application therefor is not in accordance with the provisions of this ordinance, it shall deny such application.

"Section 12. If the council finds that the operation of a jitney bus along the route selected or designated by the applicant for a jitney bus license will unduly congest traffic, or will interfere with the safe use thereof by the traveling public, it shall modify the route selected by the applicant to the extent that such selected route will not unduly congest traffic, or interfere with the safe use thereof by the traveling public and substitute in lieu of such portions other routes as near as may be along the lines selected by the applicant, and, if the applicant is then unwilling to accept the modification of the route made by the council, the council shall deny such ap-

plication. If the council finds that such application for a jitney bus license is not made in accordance with the provisions of this ordinance, it shall deny the same.

"Section 13. If such jitney bus license is granted, upon collection by the treasurer of the certified check accompanying the application therefor, which he shall do forthwith, the city comptroller shall issue to the applicant in duplicate appropriate metal plates, square in form, not less than six inches by six inches, which shall be by the owner attached on the outside of each side of the jitney bus in a conspicuous place below the driver's seat, and shall bear upon its face the inscription 'Bellingham, Wash. Jitney Bus License No. . . . .' (in the blank space shall be inserted the serial number). Such plates shall remain upon such bus during the time such license is in force, as well as during the time any renewal of the same is in force. It shall be unlawful, however, to continue such plates upon any jitney bus after the expiration or revocation of the license to operate the same as a jitney bus. Until the city comptroller procures such metal plates it shall be lawful for him to issue and for the owner to attach in such place on such jitney bus temporary cards of like size, which shall be surrendered to the comptroller and destroyed upon obtaining and issuing the metal plates herein provided for.

"Section 14. If such driver's permit is granted, upon collection by the treasurer of the certified check accompanying the application therefor, which he shall do forthwith, the city comptroller shall issue to the applicant a metal badge circular in shape and approximately two inches in diameter, containing the words 'Bellingham, Wash. Driver's Permit No. . . . .' (in the blank space shall be inserted the serial number). Such badge shall be worn on the right breast of the outer garment at all times while such person is driving or in charge of the jitney bus covered by his application, and in such manner that the same may at all times be exposed to public view. It shall be unlawful to continue to use such badge after the expiration or revocation of such driver's permit. Until the city comptroller procures such metal badges, it shall be lawful for him to issue and for the licensed driver to wear in the same place temporary card badges of like size, which shall be surrendered to the comp-

troller and destroyed upon obtaining and issuing the metal badges herein provided for.

"Section 15.  The city comptroller shall, at the time of the issuance of a driver's badge, deliver to the owner of the jitney bus license and to each licensed driver thereof identification cards which shall contain the name and address of the owner; kind of motor vehicle for which jitney bus license is issued, with maker's name, maker's factory vehicle number, maker's motor number; state or county license number; fixed passenger seating capacity of jitney bus based on license fee paid therefor hereunder; name of principal and surety company issuing bond under said chapter 57 of the acts of the legislature of the state of Washington for the year 1915; also a brief description of each person holding a driver's permit for such jitney bus, giving his name, residence, age, height, weight, color of hair, color of eyes and race.  On the reverse side of each of such identification cards shall appear the date of the issuance of such card and a certificate that the motor propelled vehicle described on the other side of such identification card has been licensed by the city of Bellingham as a jitney bus for one year from the date of the granting of such license, unless sooner revoked; the route, and termini fixed by the council under which it is to be operated and the schedule to be maintained between the hours of each day provided in this ordinance, and that . . . . . . (setting forth the name of each of the drivers) is, or are (as the case may be), licensed driver No. . . . (setting forth the serial number) licensed by the city of Bellingham for one year from the date of the granting of the application, unless sooner revoked, to drive the particular jitney bus within described over the route described.  Such identification card shall bear the signature of the owner, the signature of each of the licensed drivers and the signature of the city comptroller, and shall be stamped with the seal of the city of Bellingham.  Renewals of licenses and permits shall be had only upon like procedure as in the case of original applications. Provided, that the same serial license and permit number shall be preserved on renewals as were used in original license and permit.

"Section 16.  Such identification cards shall be delivered to the recipients in suitable receptacles, which shall be of such form and size as to contain the photograph and permit

card. Where driver's permits are issued to different persons to drive the same jitney bus the photograph attached shall in each case be the photograph of the driver to whom the permit is delivered. Such identification card shall also contain blank spaces upon which a record of any arrest of the recipient, or of any serious complaint against him, may be made, and it shall be the duty of the clerk of the court, or the court, where such case is tried to inscribe on such blank space the disposition of any case at the time of the decision of the court, and such clerk, or court, shall transmit a duplicate record of such endorsement to the city comptroller, and it shall be unlawful for any person to deface, remove, or obliterate, any entry made in the blank space herein required. The city comptroller shall keep a complete record of each license and permit, and all renewals, suspensions and revocations thereof, and all arrests and convictions made of any recipient of such license or permit; and shall promptly deliver to the chief of police a copy of each of the same.

"Section 17. Where a jitney bus license has been duly issued hereunder the owner may, upon obtaining a driver's permit as herein provided, operate such car in person, or, if he desires to operate it by his agents and employees, may, upon application and compliance herewith have issued to such agents or employees a driver's permit hereunder and have issued to them a driver's badge and identification card, entitling them to operate the particular jitney bus for which license has been issued to the owner thereof; each such agent and employee, however, to make the application for a driver's permit, pay, or cause to be paid, the driver's license tax, be found to possess the qualifications herein provided, and otherwise comply with all the provisions of this ordinance pertaining to driver's permits before they can become licensed drivers hereunder.

"Section 18. It shall be the duty of the owner of every jitney bus licensed hereunder to see to it that such jitney bus is operated, beginning at the hour of six o'clock in the morning and ending at the hour of seven o'clock in the evening, of each and every day of the week, Sundays and holidays included, on the regular uniform schedule set forth in the identification card for such jitney bus, over the entire route, allowed by the council, between the termini thereof, on each trip thereof, and upon no other route, or schedule, which

schedule shall not be so arranged as to admit of the repetition of trips in whole or in part between scheduled trips, or necessitate, require or permit, the violation of any of the traffic laws of the state of Washington, or of the city of Bellingham, but, consistent therewith, such schedule shall provide for regular, uniform continuous trips, without layoffs or interruptions during the portions of the day between the hour of six o'clock in the morning and the hour of seven o'clock in the evening; provided, that if the owner operates, or causes such jitney bus to be operated as a jitney bus, during any part of any day or night at any time other than between the hours aforesaid of each day, such operation shall be confined to the route aforesaid, but shall not, except during such hours, be required to conform to any schedule. Subject to the provisions of section 20 hereof, nothing in this ordinance shall be construed to require the operation of any jitney bus as a jitney bus except between the hours aforesaid of each day, nor shall anything in this ordinance contained be construed to permit the operation of any jitney bus as a jitney bus during any other hours of the day, except upon such route and upon compliance with all of the provisions of this ordinance, other than those pertaining to schedule. Provided further, that where any portion of such route shall be temporarily closed to vehicle traffic it shall be lawful during such closed period to deviate from such regular route and schedule only to the extent necessitated by the portion of such route so closed. Provided further, that none but drivers duly licensed hereunder shall be permitted to operate such jitney bus at any time. A failure to comply with each and all of the provisions of this section shall be deemed an unlawful act within the meaning of this ordinance.

"Section 19. It shall be unlawful for the owner of any jitney bus to fail to have operated such jitney bus between the hours aforesaid of each day, over the entire route, between the termini thereof, and according to the schedule described in the identification card for such jitney bus, or to permit a deviation from such route or schedule, or to fail, refuse, or neglect, after any trip has been commenced, to have such jitney bus operated between the termini and over the entire route or routes specified in the identification card for such jitney bus, unless the failure to maintain such schedule, or to complete such trip, shall be the result of sickness,

accident, the breaking down of the jitney bus, or the engine thereof, the closing of such route to vehicle traffic, congestion of traffic, or some circumstance in good faith beyond the control of such owner. Provided, however, that passengers may, without additional charge, be transferred to any other jitney bus licensed hereunder to complete such route. It shall be the duty of the owner holding the license under which such jitney bus is authorized to be operated to employ a sufficient number of drivers, holding driver's permits hereunder, to maintain at all times, between the hours aforesaid of each day, the schedule for such jitney bus provided herein, and as set forth in the identification card for such jitney bus, and each failure, neglect, or refusal, of such owner to have such schedule maintained shall constitute a separate offense hereunder.

"Section 20. The council, after issuing a jitney bus license for a particular route, shall, during the life of such license, to prevent undue traffic congestion, or to secure public safety, or convenience, have the power by resolution entered of record, to change, or alter, such route, schedule, or hours of operation, or either or all of them, and the owner holding such license shall comply with such change and such change shall be endorsed by the comptroller on the identification card issued for such jitney bus and its driver or drivers.

"Section 21. The holder of a jitney bus license may, upon first complying with said chapter 57 of the session laws of the state of Washington for the year 1915, and paying to the city treasurer the difference in license fee, if any, for the balance of the license year, substitute one jitney bus for another, but a description of such substituted jitney bus shall be filed with the city comptroller and chief of police and a notice of the substitution endorsed upon the identification cards issued for such jitney bus and its driver or drivers, giving the same data concerning the substituted jitney bus as was originally given of the jitney bus first used.

"Section 22. The holder of a driver's permit may, at any time during the time it is in force, have the same transferred to any other licensed jitney bus by filing with the city comptroller, for which no charge shall be made, a description of the licensed jitney bus to which the transfer is desired, and, if the holder of such driver's permit is not the owner thereof, there shall therewith be filed the designation of the owner of

such driver as his agent and employee as provided in section 9 hereof. Whereupon a new identification card shall be issued to such driver setting forth the data as to such substituted car, its route and schedule, as was originally required for the jitney bus first used.

"Section 23. No permit to drive a jitney bus shall be granted to any person until compliance with the provisions of said chapter 57 of the laws of the state of Washington has been first had as to the jitney bus so authorized to be driven.

"Section 24. No permit to drive a jitney bus shall be granted to any person under the age of eighteen years.

"Section 25. It shall be unlawful for any person having procured a driver's permit, identification card and badge under the provisions of this ordinance to voluntarily permit any other person to have in his possession such permit or identification card, or to wear such badge, or for any person, while driving any such jitney bus, to have in his possession the permit, identification card or badge of another. Said identification card shall be carried at all times by the person to whom the same was issued while driving or in charge of any such jitney bus, and shall be presented for inspection upon the request of any police officer or passenger desiring to inspect the same.

"Section 26. It shall be unlawful for any driver of a jitney bus, while the same is moving along any street, to permit any person to occupy with the driver the driver's seat in excess of its fixed seating capacity, or to be upon the running board of such jitney bus, or in any place in front of the front seat, or upon the fender, dash, door or doors, or upon the top of the seat backs, or to carry at any one time more passengers than the seating capacity for which the owner has paid a license tax on such jitney bus to the city of Bellingham.

"Section 27. It shall be unlawful for any person, while a jitney bus is moving along any street, to be upon the running board thereof, or in any place in front of the front seat, or upon the fender, dash, door or doors, or upon the top of the seat backs, or to be upon the front seat with the driver when the fixed seating capacity of the driver's seat is already occupied, or to go into or upon such jitney bus after the passenger capacity thereof indicated on such bus is filled.

"Section 28. It shall be unlawful for any person driving

such jitney bus to refuse to carry any person offering himself or herself to be carried and tendering the payment for the same to any place on the route such jitney bus is licensed hereunder to travel, between the termini thereof, unless at the time such offer is made the seating capacity for which the owner has paid a license tax on such jitney bus to the city of Bellingham is fully occupied. If a request is made by any person along said route to be carried by such person driving or operating such jitney bus and there is unoccupied a seat, for which the owner has paid a license tax as aforesaid, which may be occupied, it shall be the duty of the person driving such jitney bus to carry such passenger upon tender of the payment therefor; provided however, that the person driving or operating such jitney bus shall refuse transportation to any person at the time demand is made to be carried who is in an intoxicated condition, or afflicted with a contagious disease, or any person who at such time may be conducting himself in a boisterous manner, or who may at the time be using profane or obscene language, or who does not offer himself or herself at authorized stopping places along the route such jitney bus is licensed to travel and for transportation along such route.

"Section 29. In determining the passenger capacity of a jitney bus within the meaning of the last three preceding sections, infants in arms shall not be regarded as passengers, and two children under twelve years of age shall count as one passenger.

"Section 30. It shall be unlawful for any person to operate or drive any jitney bus unless the rear wheels thereof be equipped with adequate efficient non-skidding devices when upon a slippery street.

"Section 31. It shall be unlawful for any person to drive or operate a jitney bus unless there is carried on the front of such jitney bus a sign, plainly lettered and readable by day at a distance of fifty feet, giving the route to be traversed and the termini of said route and the price or fare charged.

"Section 32. It shall be unlawful for any person engaged in the business of driving or operating a jitney bus to charge a greater fare than five cents a passenger for one continuous trip along or between the termini such jitney bus is licensed to travel.

"Section 33.   It shall be unlawful for any person to drive, or operate. a jitney bus, or to obtain a license therefor, unless there shall have been given and there is in full force and effect at all times while such person is driving and operating such jitney bus the bond in the sum of twenty-five hundred dollars for each jitney bus so operated, issued and conditioned as provided by said chapter 57 of the laws of the state of Washington for the year 1915.

"Section 34.   It shall be unlawful for any person while driving a jitney bus to drink intoxicating liquor of any kind, or to be in any degree under the influence of intoxicating liquors, opium, or any of its alkaloids.

"Section 35.   It shall be unlawful for any person while driving a jitney bus to permit, cause, or allow, such jitney bus to cross any railroad track at any intersecting street over which trains or cars, electric or otherwise, are operated, without bringing such jitney bus to a full stop before crossing such railroad tracks.

"Section 36.   It shall be unlawful for any person to operate a jitney bus unless there is in force a valid license for such jitney bus as in this ordinance provided, or to drive the same unless there is in force a valid driver's permit for the person so driving the same.

"Section 37.   It shall be unlawful for any person operating or driving a jitney bus to permit the same to remain standing upon any paved street for the purpose of loading or unloading passengers unless the side of such jitney bus nearest to the righthand curb of such street is not more than two feet distant therefrom, nor shall passengers be permitted to enter on the left side of such jitney bus, and the door on the left side shall be fastened and locked; Provided, that where the driver's seat is upon the right hand side the passenger on the front seat may enter and leave on the left hand side, and where the entrance is in the rear passengers may enter and leave from the rear.

"Section 38.   It shall be unlawful for any person driving or operating a jitney bus to drive or operate the same during such time as such bus is driven during the night time with the top up, unless the tonneau or rear inside portion of such jitney bus shall be kept continuously lighted with not less than six candle power clear white light, the globe of which light shall be colored or shaded on the side thereof next

to the front end of the jitney bus so as not to reflect on the wind shield and interfere with the driver's vision ahead of the jitney bus.

"Section 39. It shall be unlawful for the person driving a jitney bus to stop while in the fire limits of the city of Bellingham for the purpose of accepting or discharging passengers, except such stop be made within not less than ten feet or more than fifty feet of the near side of an intersecting alley, or within not less than ten feet or more than fifty feet of the center of such blocks as contain no intersecting alley; nor shall any jitney bus stop when outside of the fire limits of the city of Bellingham on the intersection of any street, nor within twenty-five feet thereof, for the purpose of accepting or discharging passengers.

"Section 40. It shall be unlawful for any person to drive any jitney bus while there is attached thereto any trailer or other passenger carrying vehicle.

"Section 41. It shall be unlawful for any person to drive or operate a jitney bus unless such bus shall have marked upon the outside of each side thereof the words 'carrying capacity' together with a figure denoting the carrying capacity of such, which shall not exceed the number of fixed passenger seats, which numeral or numerals shall be not less than five inches in height and so placed as to be plainly visible, and any representation as to the carrying capacity of such jitney bus contrary to the provisions hereof shall be unlawful.

"Section 42. It shall be unlawful for the driver of any jitney bus to fail, neglect, or refuse to return every article unintentionally left in such jitney bus by any passenger thereof while in his charge to the police station in this city within twenty-four hours after the finding of such article.

"Section 43. It shall be unlawful for the owner, driver, or other person in charge or control of a jitney bus to charge or receive any additional amount for the transportation of any hand baggage in charge of a passenger.

"Section 44. If at any time during the life of any jitney bus license issued under the terms of this ordinance the holder thereof allows the bond required by said chapter 57 of the session laws of Washington for the year 1915 to lapse, or to become ineffective, or terminate in whole or in part, then at the same time the license of such holder to operate the

jitney bus covered by such license shall *ipso facto* become null and void.

"Section 45. The council, for incompetency, or for any unlawful act, or for improper conduct, or failure to comply with the license, permit, or any provision of this ordinance, may suspend or revoke any license or permit granted under the provisions of this ordinance, nor shall a prior conviction in any court be a necessary prerequisite to the exercise by the council of such right or authority.

"Section 46. Before any license or permit issued hereunder is revoked by the city council, the holder of such license shall be given a hearing before the city council, reasonable notice of such hearing and the time and place thereof having first been duly served upon the person to whom such license or permit was issued.

"Section 47. Every person driving or operating a jitney bus shall comply with all other state and city laws pertaining to the operating of motor vehicles whether herein specifically enumerated or referred to or not, it being the intention hereof that the remedies herein provided are cumulative and in addition to those now or hereafter enacted, whether specifically referred to herein or not.

"Section 48. It shall be unlawful for any person to violate any of the provisions of this ordinance, or to fail to observe, obey or comply with any of its provisions, whether such act or omission is by the provisions of the section in which it is contained declared to be unlawful or not, and every person who shall procure, aid or abet any person in the violation of this ordinance, or in his failure to obey, observe or comply with the provisions hereof shall also be guilty of a misdemeanor.

"Section 49. All jitney bus licenses now in force in favor of any person for such business as is by this ordinance regulated shall cease to be in force from and after ten days from the date this ordinance takes effect. At said time such license holder may have the unearned part of his license fee of the license now in force refunded, or he may have the same applied upon the fee for a new license under this ordinance; provided, a new license shall be issued to him hereunder.

"Section 50. Each violation of any of the provisions of this ordinance shall constitute a separate offense. Every

person violating any of the provisions of this ordinance shall, upon conviction thereof, be deemed guilty of a misdemeanor and shall be punished by a fine in any sum not exceeding one hundred dollars, or by imprisonment in the city jail for a period of not exceeding thirty days, or by both such fine and imprisonment, and upon a second conviction of the same person the court may, in addition to imposing such fine or imprisonment, or both, declare a forfeiture of the jitney bus license or driver's permit held by the person so convicted, and where such person holds both a jitney bus license and a driver's permit, either or both may, as a part of such sentence, be declared forfeited.

"Section 51.  Ordinance No. 2461, passed by the council of the city of Bellingham, April 19th, 1915, is hereby repealed, as are also all ordinances or parts of ordinances, in conflict herewith.

"Section 52.  If any part of this ordinance for any reason shall be held unconstitutional, invalid, void or unreasonable, such holding shall not affect the force and validity of the remaining portions thereof."

Noticing the appellant's contentions in the order in which he presents them, the first is that the ordinance is in violation of both the Federal and state constitutions.  The specific objection is that it denies to persons within its jurisdiction the equal protection of the laws, prohibited by the Federal constitution, and denies to persons privileges and immunities which upon the same terms belong to other persons, prohibited by art. 1, § 12, of the state constitution; in other words, it is discriminatory class legislation.  It is argued that the ordinance discriminates against jitney bus operators, in that it imposes upon them taxes and restrictions which it does not impose upon the operators of auto stages, sight-seeing automobiles, taxicabs, horse stages, street cars, and other carriers transporting passengers for hire within the city of Bellingham; and, furthermore, makes certain acts penal when committed by a jitney bus operator which it does not make penal when committed by the operators of other automobiles.

It is well settled that the equal protection of the four-teenth amendment to the Federal constitution does not take from the state the right or power to classify the subjects of legislation; it is only arbitrary and unreasonable classifica-tion—classification as to which there is no just difference or distinction between the class affected and others—that is thus prohibited. *Jeffrey Mfg. Co. v. Blagg*, 235 U. S. 571. So, under the state constitution, it is likewise well settled that classification for the purposes of legislation is not prohibited. The limitation imposed avoids only that which is done with-out any reasonable basis; such classification as is unreason-ble and arbitrary. *McDaniels v. Connelly Shoe Co.*, 30 Wash. 549, 71 Pac. 37, 94 Am. St. 889, 60 L. R. A. 947; *State v. Sharpless*, 31 Wash. 191, 71 Pac. 737, 96 Am. St. 893; *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466. So, also, an ordinance is not invalid under this provision of the constitution even though it may subdivide general classes. The test is, does it operate alike upon all those similarly affected, and is there a just and reasonable basis for making the distinction. *State v. Seattle Taxicab & Transfer Co.*, 90 Wash. 416, 156 Pac. 837.

The record does not disclose the character of the business conducted by the other kinds of common carriers enumerated by the appellant, and, of course, the court has only such knowledge of the matter as is possessed by the generality of mankind. In so far as we are advised, we think there is a wide distinction between the class of business done by jitney busses and that done by the other carriers named. Street cars are so far distinct as to be in a class by themselves, and any regulation applicable to a jitney bus could hardly be applicable to their situation. Auto stages operate on regular schedules between fixed points, usually between one city or town and another. Auto busses and horse carriages ordi-narily carry passengers between given points, usually to and from depots, docks or other landings, and hotels. Sight-

seeing automobiles are operated more in the nature of private conveyances than as public carriers, and their business bears no relation to the business of a jitney bus. Taxicabs, livery rigs, and the like operate from fixed stands and are put into use on hire. The jitney bus differs from each of these. It is operated continuously upon the streets, usually in the most congested parts, soliciting and taking up passengers wherever they can be found. It is never for hire at all; all that is offered is a seat and an opportunity to ride to some point within the limit of its operations. Its unrestricted use is fraught with danger, not only to the passenger it carries, but to others using the streets for their own purposes. Being a common carrier, it is a subject of regulation, and we are constrained to believe that its business is such as to make it a subject of separate classification. This being true, the city council of a municipality may lawfully exact regulations applicable to its business which it does not make applicable to the business of other common carriers, without violating either of the constitutional provisions before cited.

The ordinance, it will be observed, provides penalties for the violation of many of its regulative provisions. It is on this fact that the contention is based that the ordinance makes acts penal when committed by a jitney bus owner or operator which are not penal when committed by the owner or operator of other motor vehicles. But clearly this does not affect the constitutionality or validity of the ordinance. Since it is within the power of the city to enact special regulations applicable only to the owners and operators of jitney busses, it is likewise within its power to provide penalties for a violation of such regulations. If the regulation is valid, the penalty (within imposed limits, of course), is also valid. It is not invalid because others, not in the same situation, may lawfully do what is prohibited to the jitney bus owner or operator.

Municipal ordinances regulating the jitney traffic as a class apart from other common carriers have been enacted in

many of the principal cities of our sister states. These, in so far as we are advised, have been uniformly upheld by the highest courts of such states against attacks on the ground that they violated the equal protection and due process of law clauses in the Federal constitution, and the provisions directed against class legislation in the constitutions of the individual states. Some of the cases are the following: *City of Memphis v. State ex rel. Ryals*, 133 Tenn. 83, 179 S. W. 631; *Ex parte Bogle* (Tex. Cr.), 179 S. W. 1193; *Huston v. Des Moines* (Iowa), 156 N. W. 883; *Ex parte Dickey* (W. Va.), 85 S. E. 781; *Thielke v. Albee*, 79 Ore. 48, 153 Pac. 793; *Ex parte Cardinal*, 170 Cal. 519, 150 Pac. 348; *Hazleton v. City of Atlanta*, 144 Ga. 775, 87 S. E. 1043; *Auto Transit Co. v. Fort Worth* (Tex. Civ. App.), 182 S. W. 685.

The second contention is that the ordinance is in violation of the general statutes of the state governing and regulating the operation of motor propelled vehicles upon the public highways, whether within or without the boundaries of incorporated cities and towns. The statutes specifically pointed out are chapters 57 and 142 of the Laws of 1915, pp. 227, 385. (Rem. Code, § 5562-1 *et seq.*, and § 5562-37 *et seq.*) The first of these acts relates to carriers of passengers upon the public streets of cities of the first class. It is regulative only in a limited degree. It makes it unlawful for any person, firm, or corporation other than a steam, street or interurban railway company, to engage in or carry on the business of carrying or transporting passengers for hire in any motor propelled vehicle within the corporate limits of any city of the first class, without having obtained a permit so to do from the secretary of state, and entering into a bond running to the state, in the penal sum of $2,500, conditioned to pay all damages which may be sustained by any person injured by reason of the negligent or careless operation of the vehicle. A fee of five dollars is exacted on the procure-

ment of the license, and it is made a penal offense to operate such a vehicle for the purposes mentioned without procuring the license and entering into the bond. It does not, however, regulate in any manner the operation of the vehicle; it does not provide that it shall be operated over any prescribed route; it does not require that it shall be operated on any time schedule; it does not limit the speed at which it shall be operated; it makes no provision against overloading; in fact, it contains no provision looking to the safety of the passenger, its evident purpose being to provide a solvent fund out of which persons injured by its negligent operation can be remunerated in some degree.

The second act cited relates to motor propelled vehicles generally, and regulates their use, whether for private purposes or for the purposes of conveying passengers and freight for hire. It is applicable upon all of the highways of the state, both within and without incorporated municipalities. Briefly, it requires the owners of all motor propelled vehicles, as a condition to their use upon the public highways, to procure a license permitting such use; the vehicles must carry certain described number plates, so as to permit of identification and as proof of a compliance with the licensing section of the statute; they must have also certain safety devices, lights and warning signals; rules of the road and speed regulations are prescribed; and certain duties are imposed upon their operators to meet special and peculiar situations, the purpose being the prevention of accidents. The only specific limitation upon the power of municipalities to enact additional restrictions is found in § 34 of the act (Rem. Code, § 5562-34). This section reads:

"The local authorities shall have no power to pass or enforce any ordinance, rule or regulation requiring of the owner or operator of any motor vehicle, any license other than an occupation license or tax which may be levied in only one city or town when such motor vehicle is engaged in intercity service, or permit to use the public highways except as

herein provided or to exclude or to prohibit any motor vehicle whose owner has complied with the provisions of this act from the free use of the public highways, and all such rules, ordinances and regulations now in force are hereby declared to be of no validity or effect: *Provided, however*, that nothing herein shall be construed as limiting the power of the county commissioners or local authorities to make, enforce and maintain ordinances, rules and regulations governing traffic in addition to the provisions of this act affecting motor vehicles."

It is our opinion that neither of these acts prevents the enactment by municipalities of police regulations and restrictions and revenue measures operative within their limits not inconsistent therewith. In other words, the enactments were not intended by the legislature to be the whole law upon the given subject, but were intended as general regulations, leaving each of the separate municipalities the power to enact such additional legislation not inconsistent therewith as its peculiar needs might require. Such is the general rule, unless the legislative enactment expressly or by evident intent so declares. In addition to this, we have in this state a constitutional provision declaring that any county, city, town, or township, may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws. Const., art. 11, § 11. Other than such as are found in the section above quoted, these statutes contain no such express declaration, and the enumeration of certain prohibitions is in itself equivalent to a declaration that none other were intended.

That statutory regulation of a given occupation or business does not prohibit a city, by ordinance, from enacting additional regulations on the same subject has been repeatedly recognized as the rule in this state. In *Bellingham v. Cissna,* 44 Wash. 397, 87 Pac. 481, we held that the city could, by ordinance, regulate the speed of automobiles within its limits; in *Seattle v. Goldsmith,* 73 Wash. 54, 131 Pac. 456, that it could legislate on the subject of weights and measures; in

*In re Ferguson*, 80 Wash. 102, 141 Pac. 322, that a city could prohibit Sunday theaters; in *Hiscock v. Phinney*, 81 Wash. 117, 142 Pac. 461, Ann. Cas. 1916E 1044, that it could regulate the manner of driving automobiles over city streets; notwithstanding that in each instance general laws on the same subject had been enacted by the legislature. In *Detamore v. Hindley*, 83 Wash. 322, 145 Pac. 462, we held it a legitimate exercise of the police power by a city to require a separation of grades where a public service railroad crossed a city street, when such requirement was not in conflict with the general laws. In the course of the opinion, we cited and quoted the constitutional provision above noted, saying in connection therewith:

"This is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws."

All of these cases do not discuss the specific question, but they clearly sustain the principle involved.

The section of the statute quoted, it will be observed, provides that the local authorities shall have no power to pass or enforce any ordinance, rule or regulation requiring of the owner or operator of any motor vehicle "any license other than an occupation license or tax." It will be observed also that the third section of the ordinance exacts for each jitney, as a condition precedent to its operation, "as an occupation license or tax," the sum of five dollars for each passenger seat capacity of the jitney operated, and the sum of four dollars per annum for each driver's permit. It is objected to these, first, that they are not properly occupation taxes even though they are so designated; and second, that they render the ordinance discriminatory, because like taxes are not imposed on other motor vehicles and drivers of such vehicles engaged in the passenger traffic in the city of Bellingham. As to the first of these objections, we think the

tax imposed upon the owners or operators of the jitneys is an occupation license or tax within the meaning of the statute. If there be, in a strict legal sense, a distinction between an occupation tax and a license tax, this tax possibly partakes of the nature of both, but it is evident that the legislature treated them as one. The tax exacted is clearly a tax upon the business and, as such, is what is commonly known as an occupation tax and is within the excepted prohibition of the statute. The same is true of the tax exacted from the drivers. As an occupation tax it is not inimical to any constitutional prohibition. We have repeatedly held that municipalities may levy taxes of this sort for the purposes of both revenue and regulation.

The second objection is also without merit. The uniform taxation rule enjoined by the constitution applies only to taxes upon property; it does not require the uniform taxation of businesses. It would, of course, violate the rule against discrimination to tax one individual or one set of individuals engaging in a given business and exempt another or others engaging in the same business under like circumstances, but it does not forbid the taxation of one business while others are left exempt when there is such a just difference between the businesses as to permit of classification. Here, as we have found, there is such a just distinction, and we cannot hold the ordinance void because discriminatory.

The statute further prohibits the municipal authorities from passing any ordinance which precludes or prohibits any motor vehicle, whose owner has complied with the provisions of the act, "from the free use of the public highways." This is likewise thought to prevent the exactions imposed by the ordinance, rendering it void. But it would seem from other provisions of the act that this phrase could not have the broad meaning contended for. As we have just shown, occupation licenses or taxes are expressly permitted, and the phrase is followed in the same section by a proviso that nothing therein contained shall be construed as limiting the

power of local authorities "to make, enforce, and maintain ordinances, rules and regulations governing traffic, in addition to the provisions of the act affecting motor vehicles." The word "traffic" is manifestly used here in a secondary sense, and has reference to the business of transportation rather than to its primary meaning of interchange of commodities. As thus construed, it much narrows the meaning of the phrase "free use of the highways." The phrase does not mean unrestricted use even to those who purpose using the highways in the ordinary and customary manner, those who use them for their primary purposes, but rather that the highways shall not be denied altogether to the use of the vehicles described. But the use to which the appellant purposes putting the streets is not their ordinary or customary use, but a special one. He purposes using them for the transportation of passengers for hire, a use for which they are not primarily constructed. As to such users, we think the power of the municipality is plenary, in so far as this particular clause of the statute is concerned. It denies no form of regulation pertaining to business of this character, even to the prohibition of the business entirely.

A similar phrase in a former statute was before us in the case of *Bellingham v. Cissna*, 44 Wash. 397, 87 Pac. 481. It was there held that it did not prevent the municipality from enacting regulations, operative within its own limits, providing that drivers of automobiles should keep as near to the right side of the street as possible, and limiting the speed of automobiles in the congested parts of the municipality to less than the speed limit fixed by the statute. In the opinion it was said:

"We do not understand that the words 'free use of such public roads,' etc., as employed in § 12, conferred upon the owner of an automobile an absolute right to travel the streets of any city at such rate of speed as he might desire, provided he did not exceed twelve miles per hour, or that, by reason of such enactment, the municipal authorities could not by ordinance prevent him from so doing. . . . Our

view is that the proviso does not contemplate ordinances, rules, or regulations pertaining to the speed of automobiles which are offered to the public for hire. Such automobiles are in many respects similar in their uses and purposes to other vehicles kept for hire. The legislature evidently intended that they might be subjected to like rules and regulations by the local authorities, in so far as the same might be practical. It is customary for municipalities to regulate the rates of fare charged by the owners of cabs, carriages or other vehicles offered to the public for hire; and to designate the stands or locations which they may occupy upon the public streets. We think regulations such as these, and others that might be mentioned, are contemplated by the proviso contained in § 12."

The remaining objections are largely directed against specific provisions of the ordinance which are thought to be invalid even though the ordinance may not be void as a whole. Among those particularly pointed out, is the requirement that the jitney shall be operated over a designated route and no other, on a fixed schedule, without repetition in whole or in part of the scheduled trips; that it must be operated every day for at least thirteen hours of each day; that it must not accept or discharge passengers in the congested portion of the city at points other than near the middle of the blocks; that it must not carry in excess of its seating capacity; that it must maintain a light in the tonneau of the car during certain hours if the top of the car be up, and that it must carry signs and plates designating its route, its time schedule, with other matters. Against these it is urged that they are unreasonable and unnecessary, not required for the benefit of the public, but intended to make the operation of jitneys unprofitable, and thus are in the interest of other public carriers, particularly street cars. But it must be remembered that jitneys are public common carriers; that their business is affected by a public interest; that they operate in places where others have rights, and that their business is a subject of regulation. Since, therefore, regulation is within the power of the city, the courts will not declare

any regulation imposed to be unreasonable unless it clearly appears that it is so. Here this must be determined from the regulations themselves without the aid of extrinsic facts; it must be known from the inherent nature of the regulations that they are unduly oppressive and burdensome upon the business itself, or that they have no legitimate tendency to protect or advance the public interest. This we cannot say from a mere examination of the regulations. It is not ordinarily unduly oppressive on a carrier of passengers to require him to operate his carrier on a fixed schedule and over a fixed route, and certainly it is conducive to the public interests. Persons desiring to patronize them are entitled to know when they will appear, the direction they will go, the amount of the fare that will be charged, and the termination of the route. Indeed, regulations of this sort are adopted by most common carriers whenever possible as a matter of policy. Doubtless the operator of a single vehicle finds it more profitable to operate it where and when he pleases, but observation and experience have shown that by so doing he becomes a public menace without corresponding public benefit.

So with the other regulations objected to. The requirement that he operate for a fixed number of hours is to provide an adequate service; the requirement that he receive and discharge passengers in the middle of the block in the business sections is to mitigate traffic congestion; the requirement that he must not carry beyond the seating capacity of his carrier tends to promote the comfort and safety of his passengers; the requirement that he maintain a light in the tonneau during the hours of darkness is intended to prevent crime; and the requirement that he carry signs showing his route and time schedule is for the convenience of his patrons. Clearly these are within the powers of the city and tend to beneficial ends.

Regulation of jitney busses of the sort complained of has received consideration by the courts of other jurisdictions in a number of recent cases. They have been sustained with

practical unanimity. The cases will be found collected in the cases of *Memphis v. State of Tennessee*, L. R. A. 1916B 1151, and *State ex rel. Case v. Howell*, Ann. Cas. 1916A 1231, and the editorial notes thereto. See, also, our own case of *Tacoma v. Boutelle*, 61 Wash. 434, 112 Pac. 661, where the power of the city of Tacoma to regulate by ordinance the schedule of street car companies operating within the limits was upheld.

The objection that the ordinance was enacted in bad faith is not presented in the present record. This fact cannot be presumed by the courts from the mere enactment of regulations not in themselves illegitimate.

It is our conclusion that the ordinance is within the power of the city, and that the trial court correctly so decided. Its judgment is therefore affirmed.

ELLIS, C. J., MOUNT, CHADWICK, and MORRIS, JJ., concur.