RED STAR MOTOR DRIVERS' ASS'N *v.* CITY OF DETROIT.

1. CARRIERS — JITNEY BUSSES ARE COMMON CARRIERS — MOTOR VEHICLES—MUNICIPAL CORPORATIONS.

   Operators of jitneys are common carriers for hire, and cities may prohibit the use of their streets by them for the conduct of a business for gain.[1]

2. MUNICIPAL CORPORATIONS—HAVE RIGHT TO PROHIBIT USE OF ALL OR PART OF STREETS BY CARRIERS.

   Since a city has the right to prohibit the use of all of its streets by a common carrier, it has the right to prohibit the use of a part of them by it.[2]

3. SAME — REGULATION MUST BE REASONABLE — REASONABLENESS LEGAL QUESTION RATHER THAN ONE OF POLICY.

   For the purpose of this case only, it is assumed that where a municipality seeks to regulate the use of its streets by a common carrier instead of exercising the power it possesses of prohibiting such use, its regulations must be reasonable, and that where constitutional rights of individuals are involved the question of whether such regulation is reasonable presents a judicial question, but in considering this question it will be determined as a matter of law rather than a question of policy, which must rest in the legislative department of the city.[3]

4. SAME—CONSTITUTION OF 1909 GIVES LARGER POWERS TO MUNICIPALITIES OVER STREETS.

   Under article 8, § 28, of the Constitution of 1909, the powers of municipalities over their streets were expanded, and they were given reasonable control thereof, but previous thereto they had only such power as was delegated to them by the legislature in express terms.[4]

5. SAME — MUNICIPALITIES MAY DESIGNATE STREETS ON WHICH JITNEYS MAY AND MAY NOT OPERATE—REASONABLENESS OF REGULATION.

   Municipalities have the power to regulate the business of operating jitneys on their streets, and in exercising such

---

[1]Carriers, 10 C. J. § 1034; Municipal Corporations, 28 Cyc. p. 911 (Anno); [2]Municipal Corporations, 28 Cyc. p. 911 (Anno); [3]Id., 28 Cyc. pp. 370, 390, 853, 911 (Anno); [4]Id., 28 Cyc. p. 849.

Person or company operating passenger automobile for hire as a common carrier, see note in L. R. A. 1918F, 468.

On regulation of jitney busses, see notes in L. R. A. 1915F, 840; L. R. A. 1916B, 1151; L. R. A. 1918B, 909; L. R. A. 1918F, 475.

power they may designate the streets and the only streets which may be used for such business, and the designation of streets other than those which are already congested is not unreasonable.[5]

6. SAME—CONSTITUTIONAL LAW—PROHIBITING JITNEYS FROM OPERATING ON CONGESTED STREETS USED BY STREET CARS AND MOTOR BUSSES NOT CLASS LEGISLATION.

In view of the fact that there is a marked difference between street cars and jitneys both in construction and operation, and that motor busses quite closely resemble street cars in method of operation, it cannot be said that a city ordinance which permits street cars and motor busses to operate on certain congested streets and prohibits jitneys from operating thereon, but allows them to operate on less congested streets, is void as class legislation and unjust discrimination against the jitneys.[6]

BIRD, C. J., and WIEST and McDONALD, JJ., dissenting.

Appeal from Wayne, Hunt (Ormond F.), J. Submitted January 6, 1926. (Docket No. 26.) Decided April 14, 1926. Rehearing denied July 1, 1926.

Bill by the Red Star Motor Drivers' Association and others against the city of Detroit and others to enjoin the enforcement of an ordinance. From a decree for plaintiffs, defendants appeal. Reversed, and bill dismissed.

*Edward N. Barnard,* for plaintiffs.

*Charles P. O'Neil,* Corporation Counsel, and *Clarence E. Page,* Assistant Corporation Counsel, for defendants.

McDONALD, J. (*dissenting*). This bill was filed for the purpose of enjoining the enforcement of an ordinance of the city of Detroit, known as the jitney-bus ordinance. On the hearing a decree was entered granting the relief prayed for. The defendants have appealed.

[5]Municipal Corporations, 28 Cyc. p. 911 (Anno); [6]Constitutional Law, 12 C. J. § 860; Municipal Corporations, 28 Cyc. p. 911 (Anno).

Section 4 of the ordinance in question reads as follows:

"Every person, persons, firm or corporation operating any jitney shall supply the police department of the city of Detroit with the name, number and address of the owner and driver of and route upon which any jitney shall travel, and make a prompt report showing any change regarding same, *Provided, however,* jitneys are hereby excluded from operating on Fort street, west, Fort street, east, Michigan avenue, Grand River avenue, Woodward avenue, Gratiot avenue, Jefferson avenue, Cass avenue, John R. street and the parks and boulevards described in chapter 65 of the Compiled Ordinances of 1920."

The plaintiffs attack the validity of the proviso of this section of the ordinance, *first,* on the ground that it is unreasonable, oppressive, arbitrary and *ultra vires.*   In respect to this claim the defendants contend that the reasonableness of the ordinance is not a subject for judicial review, because the city has power to absolutely prohibit the use of its streets to jitney service, and having such power the reasonableness of any restricted use it may grant is exclusively a question for the legislative branch of the city government.   Counsel for both sides of this controversy in very able briefs have devoted much space to a discussion of the power of the city to entirely withhold the use of its streets by jitneys.   As we view it, that question is not in this case.   The ordinance does not prohibit.   It grants them the use of the streets.   The title reads:

"An ordinance to license and regulate jitneys, so called, and to provide the conditions under which they may be operated on the streets, avenues and public places of the city of Detroit; providing for the rate of fare that may be charged and providing a penalty for the violation thereof."

It licenses, regulates, and controls, and when it does so such regulation and control should be reasonable.

Assuming, but not deciding, that the city has power to prohibit, when, as in this case, it does not exercise that power, but permits them to use the streets subject to certain restrictions, the restriction so imposed must be reasonable. Its only right to control is a reasonable control, and this right it derives from the Constitution. In article 8, § 28, it is said:

"The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships."

Referring to this constitutional provision this court said in *Melconian* v. *City of Grand Rapids,* 218 Mich. 397:

"The only restriction on the control which the city may exercise over its streets under the constitutional provision is that it must be reasonable."

The constitutional provision to which we have referred places a definite limitation upon the power of the city council to legislate on the subject of the use and control of the streets. Whether in so legislating the council has regarded or ignored that limitation is a question for judicial review. *People* v. *Gibbs,* 186 Mich. 127 (Ann. Cas. 1917B, 830); *Attorney General* v. *Lindsay,* 178 Mich. 524; *City of Kalamazoo* v. *Kalamazoo Circuit Judge,* 200 Mich. 146.

This brings us to the real question in the case, viz., Is the proviso of section 4 reasonable in excluding jitney service from so many of the most extensively traveled streets? In considering this question, we should have regard to the transportation facilities and traffic conditions at the time of the enactment of the ordinance showing the necessity for it, its effect upon the public welfare, and the object sought to be accomplished by it. The ordinance should bear some reasonable and substantial relation to these conditions. The

streets are for the use of the people, and the purpose of any restriction placed upon their use should be for the benefit and accommodation or safety of the public.    The object of all legislation should be the public welfare.    So that in determining the reasonableness of this provision of the ordinance, it is important to consider how it affects the public welfare. The ordinance in question is an amendment of a former ordinance under which jitneys had been operating for some time in the streets of the city of Detroit.    They were evidently recognized as a public necessity, or at least as an aid in improving to some extent the wholly inadequate transportation facilities then in use.    The situation which existed then, and now exists, is thus expressed by the circuit judge in his opinion:

"This wonder city, doubling its population every decade, has outstripped its transportation facilities and commissioners, committees and individuals, some legally appointed and others voluntarily contributing thereto, have investigated and reported and others are now re-investigating this problem.    The pulpit, the platform, the press, each has been a forum for traffic solution propaganda."

In view of these conditions it cannot be said that, in so far as it affected their means of transportation, it was a benefit to the people of Detroit to exclude the jitney service from the streets mentioned in section 4 of the ordinance.    They needed more service, not less.    Nor do we think it was necessary in the interests of the public safety.    Any of the known agencies of public transportation over the streets of large cities is dangerous.    Properly safeguarded in its use, the automobile is no more dangerous than the street car or the motor bus.    It is true that poor equipment and the handling of such vehicles by inexperienced and reckless drivers is fraught with danger to the public, but these dangers are sufficiently

and properly safeguarded by the ordinance.  To entirely exclude them from those streets where the travel was greatest seems not to have been necessary for the public safety.  The ease and safety in moving traffic in congested districts does not depend upon the number of vehicles in the street, but upon the methods employed.  The safest place on a city street is where the modern traffic rules are enforced, and this regardless of the density of the traffic.  Any man who has observed the manner of handling traffic in the downtown sections of large cities will indorse the conclusions of the witness, Mr. Schaab, who testifying in this case said:

"If a man drives safely he is no more in a hazardous position in the downtown district than in any other district where there is less traffic.  I would say the greatest number of accidents occur in districts where there is no policeman in charge of traffic.  Proper regulations would prevent the number of accidents. In the downtown sections they have a regular stop signal on the towers that is worked automatically all the way up Woodward avenue, at one time.  *  *  * There are three lights on the towers, green to go, yellow to clear, and red to stop."

From this it would appear that there was no necessity in the interests of public safety to exclude jitney automobiles from  the streets designated in section 4 of the ordinance.  In discussing this phase of the case, we are not considering the motive which brought about the enactment of this ordinance.  With that we are not concerned.  But the object sought to be attained and its effect upon the public welfare is a proper subject for inquiry.

This ordinance is unusual in that, presumably to better the public service, it licenses jitneys to operate in the city, and then excludes them from all of the main arteries of travel where there is the greatest

public need for them.   We quote from the brief of counsel for the plaintiffs:

"It excludes from the operation of the ordinance the privilege of running jitneys upon 'Fort street, west, Fort street, east, Michigan avenue, Grand River avenue, Woodward avenue, Gratiot avenue, Jefferson avenue, Cass avenue, John R. street and the parks and boulevards described in the Compiled Ordinances of 1920.'    Referring to chapter 65 of the Compiled Ordinances of 1920, we find that the boulevards described therein include: Grand Boulevard, east and west, Lafayette Boulevard, Boston Boulevard, Chicago Boulevard, Arden Park, La Salle Boulevard, Washington Boulevard, Second Boulevard and Dexter Boulevard."

If the jitneys are expected to render any considerable public service, and that is why they are licensed, it cannot be done if they are not allowed to go upon the excluded streets.    It is well known that most of these streets are the main arteries of traffic and radiate from the business center of the city like the spokes of a wheel, and because of this it is impracticable to substitute other routes.    One of the witnesses for the city suggested some substitute routes to which counsel for the plaintiffs makes the following objections, in which the situation seems to be correctly stated:

"They are not extended over any main, trunk-line highway or thoroughfare; they intersect 'through streets' time and time without number; the Grand River route, so-called, crosses Grand River avenue in a zig-zag course six different times, and at one point along this substitute route a passenger desiring to 'go out' Grand River avenue would find himself over two miles from that highway; the streets over which these routes extend are poorly paved, badly lighted and in many instances lined with shade trees which shed their leaves in autumn upon slippery block pavements, never intended for traffic of this character; they are not only inconvenient but dangerous; no one, de-

siring rapid transit, could be induced to become a passenger over them; they do not run into the center of the city; they twist and turn their way in such a manner that it would require the expert services of a civil engineer to assist a prospective passenger to his destination."

A reading of this ordinance with reference to the traffic conditions existing in the city of Detroit at the time of its enactment fails to disclose any possible benefit to the public by excluding jitney cars from the streets designated in section 4. The great need of the people was for more transportation facilities instead of less. The jitney service now conducted with the various safeguards provided by the ordinance is a safe, convenient and comparatively rapid method of transporting people from one point to another in the city. The testimony shows that they need the service. The ordinance reduces it. Beyond question, its enforcement will not operate for the public benefit. It will be to the detriment of the people to the extent that it deprives them of transportation which they so much need, and which the city is required to furnish.

In view of the inadequacy of the transportation facilities in the city of Detroit, and considered in its relation to the public welfare, we are of the opinion that the proviso of section 4 of this ordinance is so unreasonable as to be beyond the police power of the city to enact, and is therefor void. In all other respects it is valid.

No other questions require discussion.

The decree of the circuit court should be affirmed, with costs to the plaintiffs.

Bird, C. J., and Wiest, J., concurred with McDonald, J.

Fellows, J. I am not persuaded that the ordinance before us is invalid or that plaintiffs' constitutional rights asserted against it have been invaded by

its provisions here assailed.    I am, therefore, constrained to dissent from the opinion written by Mr. Justice MCDONALD.    It must be accepted as settled by *Melconian* v. *City of Grand Rapids*, 218 Mich. 397, that plaintiffs are common carriers for hire and that cities may prohibit the use of their streets by them for the conduct of a business for gain.    It was there said:

"The plaintiffs, however, as common carriers have no right to such use for private gain without the consent of the city.    Their use is accorded as a mere privilege, and not as a matter of inherent or natural right (citing authorities).

"The distinction between the use by the public in the usual way for pleasure or business and as a place or instrumentality for business for private gain is fundamental.    While as to the former the power to regulate must be sparingly exercised and only when necessary in the public interest, as to the latter the right to use may be given or withheld."

Speaking for myself, I am persuaded that that case settles the questions involved in this case adversely to plaintiffs' contention.    I think if the city has the right to prohibit the use of all its streets by a common carrier, and we so held in that case, it has the right to prohibit the use of a part of them by a common carrier.    But the question here before us, *i. e.,* the control of the municipalities over their streets when the use of such streets is demanded by a common carrier, is so far reaching and so important that I purpose to consider it as presented here at some length.

I shall assume for the purpose of this case, and for that purpose only, that where the municipality seeks to regulate the use of its streets by a common carrier instead of exercising the power it possesses of prohibiting such use, its regulations must be reasonable, and that where constitutional rights of the individuals are involved the question of whether such regulation

is reasonable presents a judicial question.  *Michigan Telephone Co.* v. *City of St. Joseph,* 121 Mich. 502 (47 L. R. A. 87, 80 Am. St. Rep. 520) ; *City of Kalamazoo* v. *Kalamazoo Circuit Judge,* 200 Mich. 146; *People* v. *Gibbs,* 186 Mich. 127 (Ann. Cas. 1917B, 830). But, in considering this question, we must bear in mind that we are determining a legal question as to whether the regulation is unreasonable as matter of law rather than a question of policy which must rest in the legislative department of the city.

Before taking up the cases from other jurisdictions dealing with the precise questions here involved, the contention of plaintiffs' counsel that they are inapplicable because the constitutions of other States differ from ours should be noted.    It is true that other constitutions differ from ours but that fact does not inure to plaintiffs' benefit.    In most of the States of the Union the municipalities possess only such power as is delegated to them by the legislature and delegated by express terms.    This was true here before the Constitution of 1909.    But the people by that instrument (art. 8, § 28) took from the legislature certain of its former powers over municipalities and reserved to them reasonable control over their streets in the following language:

"The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships."

This is an expansion of the powers of municipalities rather than in derogation of them (*People* v. *McGraw,* 184 Mich. 233), and renders applicable the decisions of other States where the municipalities possess less power than here.

The leading case of *Ex parte Dickey,* 76 W. Va. 576 (85 S. E. 781, L. R. A. 1916F, 840, P. U. R. 1915E, 93), cited with approval and quoted from in

the *Melconian Case,* is especially in point here. The court there had before it an ordinance which gave to the commission the power to change the route applied for as well as the hours set forth in the application and to grant the license upon such changed route and hours. I quote further from that case:

"Conveyances on the streets, for the use of the general public, are of the same character, and, in addition to this, cabs, hackney coaches, omnibuses, taxi-cabs and hacks, when unnecessarily numerous, interfere with ordinary traffic and travel and obstruct them. Prescription of routes or places of business for them is a fair, reasonable and efficacious means of preventing such results."

In *Desser* v. *City of Wichita,* 96 Kan. 820 (153 Pac. 1194, L. R. A. 1916D, 246), the ordinance reserved certain streets from use by the jitneys. The validity of the ordinance was sustained and it was said:

"Modern requirements for municipal transportation render it essential that the power to regulate by the governing body be broad. * * *
"Whatever natural right a citizen may have to traverse the streets of his city with a motor vehicle for the conveyance of his family or his friends, no inherent right exists to devote his vehicle to the public use of carrying passengers for hire and to appropriate to himself the use of all the streets for purposes of profit."

Likewise in *Fritz* v. *Presbrey,* 44 R. I. 207 (116 Atl. 419), the ordinance excluded the jitneys from the use of the streets in the central part of the city of Providence. The ordinance was sustained and the court said:

"The regulation of vehicular traffic in the crowded streets of the city of Providence for the purpose of promoting the safety and convenience of the people using those streets presents a proper subject for the exercise of the police power. Whether the policy of the city council, embodied in the ordinance, presents

the best scheme of regulation is not a judicial question.   The complainants should not be granted an injunction, permanent or temporary, until they have established unmistakably that the ordinance in question is an arbitrary exercise of power or that its provisions have no reasonable relation to the promotion of the safety and convenience of the public, as a whole, in its use of the highways within said prescribed area."

In the recent case of *Schultz* v. *City of Duluth* (Minn.), 203 N. W. 449, the ordinance before the court reserved from the use by jitneys the streets of the city having double street car tracks.   The ordinance was held to be valid and it was said:

"It is to be noted that appellant may use in his business any of the numerous streets in the city at all times without restriction, save only the streets whereon street cars operate over double tracks.   This cannot be held an unreasonable regulation, and the ordinance is not really open to the charge that it is prohibitory.   *   *   *   To do business upon public streets is not a matter of right like the right of ordinary travel.   Nor is the right to carry on such a business to be placed upon the same basis as that of conducting a lawful occupation upon private property within a municipality.   The use of public streets for private enterprise may be for the public good, but, even so, it is a privilege that may be granted, regulated, or withheld."

In the case of *Taylor* v. *City of Toledo,* 15 Ohio App. 475, the court had before it a regulation by the director of public safety prohibiting the use of certain streets in the congested business district of the city by motor busses operated for hire.   It is somewhat refreshing to note that the court recognized the rights of pedestrians to use the street.   It was there said:

"If the order of the director of public safety was made wholly or in part with the view of furthering the safety of pedestrians in crossing the streets, it certainly is commendable.   More than twenty-five

years ago, in the case of *Cincinnati Street R. Co.* v. *Snell,* 54 Ohio St. 197 (43 N. E. 207), the Supreme Court of Ohio, in speaking through Spear, J., of the rights of foot travelers upon the public streets, used the following language at page 204:

"'Ancient rights have not changed because new vehicles of travel have been introduced upon the streets, nor because a portion of the people who ride, being in haste to reach their destination, demand rapid transit. The streets remain for all the people, and he who goes afoot has the right, especially at a crossing, to walk to his destination; he should not be compelled to run or to dodge and scramble, to avoid collision with vehicles. * * * Life and limb are of more consequence than quick transit. The vehicle man must not run down the pedestrian.' "

I pause long enough to observe that, in this automobile age of haste and speed, we have a possible tendency to forget that pedestrians have the right to use the streets of our cities, and I do not believe it is settled beyond peradventure that their safety would be increased by an increase in the number of automobiles on the street or an increase in their speed. In the early days of the automobile, it was said by the Massachusetts court (*Commonwealth* v. *Kingsbury,* 199 Mass. 542 [85 N. E. 848, L. R. A. 1915E, 264, 127 Am. St. Rep. 513]):

"It seems too plain for discussion that, with a view to the safety of the public, the legislature may pass laws regulating the speed of such machines when running upon highways. The same principle is applicable to a determination by the legislature that there are some streets and ways on which such machines should not be allowed at all."

In *City of San Antonio* v. *Fetzer,* 241 S. W. (Tex. Civ. App.) 1034, the ordinance limited the jitneys to the use of certain streets. The court said:

"But this inherent right of the citizen to the use of the streets ceases abruptly when he reaches the maximum of such use in the ordinary or normal pur-

suit of his personal pleasure or private business. Passing that point, he exceeds his natural right, and burdens the streets with an unusual use, thus encroaching upon the paramount rights of the public at large. It is at this juncture that the city commissioners, as substitute trustee for the public, enter with the power to determine whether or not, or to what extent, or upon what streets, this extraordinary use will be permitted."

In *Frick* v. *City of Gary,* 192 Ind. 76 (135 N. E. 346), the ordinance prohibited the use of certain streets by jitneys. The validity of the ordinance was sustained. This is true of *Giglio* v. *Barrett,* 207 Ala. 278 (92 South. 668), and *Gill* v. *City of Dallas,* (Tex. Civ. App.) 209 S. W. 209. In *City of Memphis* v. *State, ex rel. Ryals,* 133 Tenn. 83 (179 S. W. 631, L. R. A. 1916B, 1151, Ann. Cas. 1917C, 1056, P. U. R. 1916A, 825), it was said:

"It is too clear for extended discussion that it was competent for the legislature under the police power to regulate the use of the streets and public places by jitney operators, who, as common carriers, have no vested right to use the same without complying with a requirement as to obtaining a permit or license. The right to make such use is a franchise, to be withheld or granted as the legislature may see fit."

In *Lane* v. *Whitaker,* 275 Fed. 476, it was said:

"The citizen has the right of travel upon the highways, and may transport his property thereon in the ordinary course of life and business; but this is a very different thing than permitting the highway to be used for commercial purposes, as a place of business, for private gain, in running jitney busses. The right, common to all, to the use of highways, is the ordinary use made thereof; but where, for private gain, a jitney owner wants a special and extraordinary benefit from the highway, to use it for such commercial purpose, the legislature may, in the exercise of its police powers, wholly deny such use or it may permit it to some and deny it to others, and this is because of the extraordinary nature of such use."

A leading case, probably cited as frequently as any other, is *Greene* v. *City of San Antonio*, 178 S. W. (Tex. Civ. App.) 6.   In that case it was said:

"But it is contended that the regulation must be reasonable.   Let that rule be admitted, and where is the unreasonableness of the ordinance to be found? The drivers of jitney cars have placed in their charge and keeping the lives and persons of men, women, and children, and it would not only be unreasonable, but criminal, for the city to turn them loose on the streets unrestrained by any restrictions."

The California court (*In re Cardinal*, 170 Cal. 519 [150 Pac. 348, L. R. A. 1915F, 850]) has thus spoken on the subject:

"It is a matter of common knowledge on the part of those familiar with conditions in our large cities that the comparatively recent introduction of this class of vehicle, commonly known as the 'jitney,' for the carriage of passengers on the public streets, for a charge closely approximating that made on street cars, in view of the almost phenomenal growth of the institution, has made clearly apparent the necessity of some special regulations in order to reasonably provide for the comfort and safety of the public."

In the recent case of *Packard* v. *Banton*, 264 U. S. 140 (44 Sup. Ct. 257), which cited with approval the *Melconian Case*, it was said:

"If the State determines that the use of streets for private purposes in the usual and ordinary manner shall be preferred over their use by common carriers for hire, there is nothing in the Fourteenth Amendment to prevent.   The streets belong to the public and are primarily for the use of the public in the ordinary way.   Their use for the purposes of gain is special and extraordinary and, generally at least, may be prohibited or conditioned as the legislature deems proper."

These cases are in my judgment in consonance with the overwhelming weight of authority and demonstrate

beyond cavil that the municipality has the power to regulate the business of operating jitneys on its streets and that in exercising such power it may designate the streets and the only streets which may be used for such business, and that the designation of streets other than those which are already congested is not unreasonable.

But it is urged that the ordinance is class legislation. It is pointed out that under another ordinance motor busses are permitted to operate on streets where jitneys are prohibited from running, and that the street railway now owned by the city also operates on these streets, and it is insisted that this is an unconstitutional discrimination against plaintiffs for the benefit of the city and the motor busses. There is a marked difference between the street car and the jitney, both in construction and operation, and the record discloses that the motor busses quite closely resemble the street car in their operation. There are two types of them, the double deckers, accommodating from 52 to 60 passengers, are operated as are street cars by a motorman and conductor, and the single deckers accommodating 29 passengers. They operate on fixed schedules and over fixed routes at low rates, give transfers and pay as specific taxes for the use of the street around $50,000 a year to the city. In most of the cases I have called attention to, the same objection to the ordinance was made and overruled and possibly it would be sufficient to only challenge attention to them without further comment. But the objection is pressed with vigor and will receive further consideration.

In *Huston* v. *City of Des Moines,* 176 Iowa, 455 (156 N. W. 883), the same claim was made. There, as I understand it, the street car system was privately owned. It was there said:

"Lastly, it is insisted that the statute and ordinance

in question were passed in the interest of the street car system, and for the benefit of 'intrenched interests,' with the intent and purpose of driving 'jitney' busses from the streets, thus depriving plaintiff of his right to use his property and to make a living.    If this were true, the question would be largely a political, and not a judicial one.    The remedy would be at the polls, and not in the courts.    But it is well settled that the motives of a city council, in passing an ordinance, or of a legislature, in enacting a statute, as a general rule, cannot be inquired into by the courts."

In *Ex parte Dickey, supra*, it was said:

"Our conclusion is that the ordinance is free from constitutional and other defects and, therefore, valid. It may be burdensome, and, in the opinion of many people, oppressive and unwise, just as many other valid laws are regarded.    But the question submitted here is one of municipal power, not policy.    With the latter the courts have nothing to do, nor can they overthrow laws, ordinances or regulations made by competent authority, merely because, in the opinion of the judges, they might or should have been made more liberal or less rigorous."

And in *City of Memphis* v. *State, ex rel. Ryals, supra*, considering the question of classification, it was said:

"However, classification for such purposes is not invalid because not depending on scientific or marked differences in things and persons, or in their relations. It suffices if it is practical, and it is not reviewable unless palpably arbitrary."

In *State* v. *Seattle Taxicab & Transfer Co.*, 90 Wash. 416, 430 (156 Pac. 837), it was said:

"It may be true that the act is burdensome, and will prevent many from engaging in this form of traffic who would otherwise engage therein.    But this is true of all regulation, and to argue that this act is void for this reason is to argue that any form of regulation is void.    These, moreover, are not questions for the consideration of the courts.    With the courts

the question is one of power, not one of policy.    The courts cannot overthrow statutes enacted by competent authority merely because, in the opinion of the judges, they could or should have been made less rigorous."

And the same court in *Allen* v. *City of Bellingham*, 95 Wash. 12 (163 Pac. 18), had before it the claim that the classification between jitneys and taxicabs and livery rigs was class legislation.    In denying the claim it was said:

"The jitney bus differs from each of these.    It is operated continuously upon the streets, usually in the most congested parts, soliciting and taking up passengers wherever they can be found.    It is never for hire at all; all that is offered is a seat and an opportunity to ride to some point within the limit of its operations.    Its unrestricted use is fraught with danger, not only to the passenger it carries, but to others using the streets for their own purposes. Being a common carrier, it is a subject of regulation, and we are constrained to believe that its business is such as to make it a subject of separate classification.    This being true, the city council of a municipality may lawfully exact regulations applicable to its business which it does not make applicable to the business of other common carriers, without violating either of the constitutional provisions before cited.    *    *    *

"Municipal ordinances regulating the jitney traffic as a class apart from other common carriers have been enacted in many of the principal cities of our sister States.    These, in so far as we are advised, have been uniformly upheld by the highest courts of such States against attacks on the ground that they violated the equal protection and due process of law clauses in the Federal Constitution, and the provisions directed against class legislation in the constitutions of the individual States."

In *Decker* v. *City of Wichita*, 109 Kan. 796 (202 Pac. 89), it was said:

"It will be observed, however, that under the ordinance the plaintiffs were at liberty to operate in certain

sections of the city under regulations which forbade them to select or receive passengers in the central and crowded sections of the city where the lines of the street railroad are laid.    In the judgment of the determining authority, the continuance of efficient transportation in the city and the convenience and welfare of the traveling public required such limitations, and it cannot be said that the commission acted unreasonably or that it transcended its authority in the enactment of the ordinance.    It may be, as suggested, that the trend of the times indicates that the days of transportation by street cars over fixed tracks in the streets of cities are numbered, and that the system will soon be supplanted by the more mobile one of carrying passengers in motor vehicles.    Each system has its advantages; but the power and discretion of determining whether one would be more advantageous to the public than the other, or whether the public interest warrants the employment of both kinds of service, each functioning in different districts of the city, belong in the legislative field into which the court may not enter."

I have considered at length cases which to my mind are persuasive that we should sustain the validity of this ordinance, that sustain the majority rule.    There are a few cases, and very few of them, which may be out of line with these holdings.    The court in *Curry* v. *Osborne,* 76 Fla. 108 (79 South. 293), held an ordinance of the city of Miami regulating jitneys invalid.    But it should be noted that while the court there held the ordinance to be unreasonable, it also held that the city had not been delegated the power to enact it.    In *City of Columbia* v. *Alexander,* 125 S. C. 530 (119 S. E. 241, 32 A. L. R. 746), the court held that an ordinance excluding the jitneys from Main street between the State house and the postoffice was invalid.    The holding was by a divided court.    In *Peace* v. *McAdoo,* 110 N. Y. App. Div. 13 (96 N. Y. Supp. 1039), an order of the police commissioner limiting the movement of teams or vehicles

in parts of certain streets was held invalid.    There was likewise dissent in this case.    *Jitney Bus Ass'n v. City of Wilkes-Barre,* 256 Pa. 462 (100 Atl. 954), is the only case I have examined which declined to differentiate between the right to use the street for its usual purpose and for commercial gain, but the court did say:

"But, if, from the usual manner of operating certain vehicles, the public safety is endangered, the right and duty of special regulation is clear."

The trial judge was very liberal in admitting proof and we have before us an ample record of three volumes.    The testimony took a wide range and many witnesses expressed their views on the never-ending problem of settling the transportation question of the city of Detroit.    Many witnesses thought the jitney necessary to relieve congestion and preferred that service to that afforded by street cars and motor busses.    The officers of plaintiff associations by advertisement invited all who favored the jitneys to voluntarily come and testify and many responded to the call.    The testimony discloses that considerable portions of the sidewalks in the congested downtown district are appropriated by the jitney business for "stations" and they there have "starters" to aid in getting the passengers into the proper machine and away on their trip.    This is regarded as desirable and highly essential for the profitable conduct of plaintiffs' business.    But this appropriation of the streets for private gain is not authorized in law.    *Mester v. Morman,* 227 Mich. 364.    The plaintiffs' witnesses all thought the jitney service highly desirable.    On the other hand, there will be found page after page of the record showing infractions by jitney drivers of speed and other traffic regulations.    Indeed, one witness who had formerly been a jitney driver testified

234—Mich.—27.

that he quit because he had to violate too many ordinances to make a living in the business.    No doubt the officers of the associations did everything in their power to prevent such infractions by members and gave time to the investigation of the transportation problem.    My Brother quotes from the testimony of one of them.    On the other hand, the city was likewise studying the problem.    The head of the traffic department of the Detroit metropolitan police department had made a study of traffic conditions.    He was in better position to speak on the subject than any other witness called.    I quote from his testimony:

"The traffic department has in charge the supervision of the traffic of the entire city, to see that it is regulated for the preservation of public safety. We assign officers to regulate the crossing at intersections, also officers to check up on the violators of traffic regulations, such as motor cycle officers, parking regulations, etc.    The licensing of taxicabs and pleasure vehicles, motor busses, jitneys, and all other vehicles that use the streets for hire come under the license division of the police department—that is a separate department—but the study of the streets, the way accidents occur, and traffic conditions generally are in our department.    Previous to May, 1921, I found that over 2,000 jitneys had been licensed to operate in the city streets; all these licenses were in force at one time; and investigations showed that, as a result, there was considerable congestion and delayed traffic on all the routes and main thoroughfares downtown.    These investigations were made by myself and the men under my supervision.    I deemed it advisable, as a representative of the police department, that the routes be changed in order to relieve traffic congestion and reduce accidents for the general public's safety."

As a result of this investigation and a report upon it, the ordinance now before us was passed.    The legislative department of the city of Detroit has determined that this ordinance is for the public welfare,

for the public good.   Courts of last resort are daily enforcing police regulations that no member. of the court would vote for if they were sitting as legislators. But sitting as members of the court they determine not the policy of the regulation but the two questions: (1) Has the municipality the power to enact the regulation?   (2) Has such power been so arbitrarily and capriciously exercised as to make the regulation unreasonable and deprive the complaining party of their constitutional rights?   With due regard to our function in the case, I think we should declare the ordinance before us valid as against the objections urged.

The ·decree is reversed and one here entered dismissing the bill, with costs of both courts.

SHARPE, SNOW, STEERE, and CLARK, JJ., concurred. with FELLOWS, J.