# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 54208-1-II |
| ROGER WILLIAM CHRISTOPHER, | |
| Respondent, | Consolidated With<br>No. 54878-0-II |
| v. | |
| CONNIE SUE CHRISTOPHER, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — In this highly-litigated dissolution case, Connie Christopher appeals the 2019 parenting plan, child support order, and final divorce order entered on dissolution of her marriage with Roger.[1] Connie also appeals a May 2020 contempt order entered against her for disobeying the parenting plan. The trial court appointed Dr. Kirk Johnson to conduct a parenting evaluation and he submitted a report to the court. Connie hired an expert who testified that Dr. Johnson's report was flawed. The parenting plan the trial court entered followed Dr. Johnson's recommendations. Connie argues that the trial court erred (1) when it relied on Dr. Johnson's report because it abdicated its role as a the fact-finder to Dr. Johnson; (2) when it relied on Dr. Johnson's biased and irredeemably flawed report; (3) in finding Connie in contempt because the

---

[1] Because Connie Christopher and Roger Christopher share the same last name, we refer to them by their first names for clarity. We intend no disrespect.

order was the result of the flawed parenting plan; and (4) when it imputed income to Connie to determine child support. We find no error and affirm.[2]

FACTS

I. BACKGROUND

Connie and Roger Christopher married in 1993 and separated on April 20, 2017. The couple have ten children, six of whom were minors at the time of dissolution and subject to the parenting plan Connie challenges here. The three youngest children are triplet boys whom the Christophers adopted in 2014. The three older children subject to the parenting plan are daughters; the eldest was a teenager at the time of dissolution. Earlier temporary parenting plans also included an older daughter, who turned 18 during dissolution proceedings.

During the marriage, Roger worked as a construction contractor and rental property owner and manager. He also earned income from farming. Connie did not work outside the home during the course of the marriage.

The couple adopted the triplets in 2014. Shortly thereafter, Connie and the older daughters began attending a different church than the one the family previously attended together.

---

[2] Following oral argument, Roger submitted a document entitled "Statement of Additional Authorities." Respondent's Statement of Additional Authorities, *In re Marriage of Christopher*, No. 54208-1-II (Wash. Ct. App. Sept. 7, 2021). This document contained no authorities, but rather contained cites to the record and short arguments in an attempt to support and/or refute arguments presented at oral argument. This is improper under RAP 10.8. Connie filed a motion to strike this document. Petitioner's Motion to Strike Statement of Additional Authority, *In re Marriage of Christopher*, No. 54208-1-II (Wash. Ct. App. Sept. 8, 2021). Because Roger's document is improper under RAP 10.8, we hereby GRANT the motion to strike, and we do not consider Respondent's Statement of Additional Authorities.

In November 2016, Roger left the family home with the triplet boys and left Connie a letter stating his plans for separation. Roger and Connie briefly reconciled during Thanksgiving 2016, and then Roger and the triplet boys returned to the marital home in early 2017.

The Christophers sold the marital home on March 31, 2017. Roger left the house with the triplet boys on April 5, an arrangement which Connie testified she did not agree to. Connie moved out of the house on April 20. From April to September 2017, Connie worked at multiple jobs, including at a blueberry field, catering, working at an amphitheater, and decorating.[3] Roger filed for dissolution in September 2017.

## II. PARENTING EVALUATOR REPORT

In December 2017, the trial court established a temporary parenting plan and spousal and child support order. The December 2017 temporary parenting plan named Roger the primary parent for the triplet boys and Connie the primary parent for the minor daughters. The temporary parenting plan also provided for visitation for each parent.

The trial court appointed psychologist Dr. Kirk Johnson as a Parenting Evaluator/ Investigator. The court instructed Dr. Johnson investigate "[a]ll issues related to making a parenting plan for these children. Abandonment, alienation, or neglect by [Roger] and [Connie]. Domestic violence of [Roger] and [Connie]. Mental health issues of [Roger] and [Connie]. Any other issues discovered that could affect the *safety* of the children." Clerk's Papers (CP) at 14 (emphasis in original). The trial court also appointed Dr. Harry Dudley to conduct reunification counseling.

---

[3] Although Connie testified that her job was "being a mother, [a] full-time job," she also stated she was not able to work because she was "doing court things." 5 VRP (Aug. 29, 2019) at 816.

Dr. Johnson submitted a report to the trial court and parties in March 2019. Dr. Johnson conducted his research between 2017 and 2019. He based his report on interviews with Connie, Roger, and most of the children, and administered a psychological personality test to the parents. Dr. Johnson also contacted Dr. Dudley and reviewed more than 30 documents and declarations related to the family and parenting plan.

Dr. Johnson's report stated:

Roger believes that he did contribute to the breakup of the relationship. He feels he was not patient and may not have always 'listened.' Connie could provide no way she contributed to the breakup of the relationship.

. . .

This case has been remarkable for the amount of animosity and vitriol expressed by Connie Christopher toward Roger. She essentially has said that she has never loved him and made a fundamental mistake in marrying him. She describes him as abusive in all regards, in fact adding 6 categories of abuse to a form filled out by custody litigants that already lists 11 areas of possible concern. She indicates that he has sexual[ly] mistreated her, physically mistreated her, socially mistreated her and spiritually mistreated her. . . .

. . .

Roger Christopher denies any abusive conduct. He believes that Connie uses conflict abusively and herself has some form of long-term emotional impairment. He feels she is rather passive aggressive and believes that she has actively worked to negatively impact the relationship he has with the children, particularly the girls. He feels that as the marriage progressed she seemed to try to keep him out of the children's lives. . . .

CP at 543-44.

Dr. Johnson noted that both parents sought to be the primary parent. He summarized the results of the psychological testing:

The results of Roger's testing were basically unremarkable. Connie's testing was consistent with her overall presentation. Her testing suggest a high degree of anger, a rather brittle lack of personal awareness, paranoid sensitivity and overactivity, along with a tendency to project all problem[s] externally. Connie essentially does

not see herself as contributing to this problem, consistent with some of the written material returned.

Interviews of the children, including the older boys and the younger girls are consistent with concerns over alienating behavior on Connie's part. Both boys addressed such behavior directly, observing conduct that raises concerns over her ability to act in a manner that is not alienating from Roger. The two older girls interviewed acted like children who were aligning with one parent against the other related to influence, intentional or not, from that parent. They were non-specific in complaints about their father and complaints were ultimately rather trivial. There were statements made suggesting direct influence.

CP at 544.

Dr. Johnson then assessed potential residential provisions by applying each of the factors

listed in RCW 26.09.187.[4] He explained that to improve the children's relationships with each

---

[4] RCW 26.09.187(3)(a) provides, in pertinent part:

The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. . . . [T]he court shall consider the following factors:
(i) The relative strength, nature, and stability of the child's relationship with each parent;
(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
(iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
(iv) The emotional needs and developmental level of the child;
(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

other and the adults, "[a] plan should be in place that allows for more normal or at least more extensive contact between the siblings." CP at 546. Dr. Johnson noted concern that the wishes of the older daughters—who expressed a preference to remain with Connie—were influenced in an unhealthy way from their mother.

In examining possible limitations on the residential time under RCW 26.09.191,[5] Dr. Johnson concluded that although Connie raised the issue of abuse by Roger, he found no evidence to support her allegations. Thus, Dr. Johnson concluded his report with a recommendation for a parenting plan:

> It is recommended that the girls go to a week on week off type schedule. This will substantially increase their time not only with their father, but also with their younger brothers. If Connie attempts to in any way poison this change in schedule it may be necessary to actually reduce her contact with the children to some level of supervision.
>
> The boys should remain with Roger at this point, while visiting with their mother on the weekends shared with the sisters. Roger thus remains the primary parent of the triplets, with little change to their schedule. As Connie demonstrates her capacity to understand her contribution to difficulties and manage her conduct, this should be reevaluated to increase the time she has with the boys.
>
> A standard alternating holiday schedule is suggested. Each parent should be allowed two two-week blocks in summer for planned holiday. These blocks might be altered to fit individual schedules if both parties agree.
>
> The appointment of a parenting coordinator is considered, but not yet recommended. . . .

CP at 547-48.

---

[5] RCW 26.09.191 lists potential restrictions in temporary or permanent parenting plans as it relates to abandonment, physical, sexual, or emotional abuse, or other domestic violence.

After Dr. Johnson sent his report to the parties, Roger moved the trial court to adopt Dr. Johnson's recommendations and adjust the residential schedule and child support. On May 24, 2019, the parties then stipulated to an interim parenting plan that kept most of the provisions of the December 2017 temporary parenting plan intact but added overnight visits with the children during the parents' weekend visitation time. The interim plan also modified the Memorial Day and summer schedule slightly. The court reserved ruling on child support until trial.

## III. TRIAL AND EXPERT TESTIMONY

The case proceeded to trial in August 2019. During the three-day trial, Dr. Johnson, Dr. Dudley, and both parents testified. None of the children testified. Connie called Dr. Landon Poppleton to testify regarding Dr. Johnson's report.

### A. *Dr. Johnson's Testimony*

At trial, Dr. Johnson explained the methodology of the psychological testing he performed and the test results, summarizing his report. He noted that although "Roger was able to recognize that he did make some contribution to the difficulties in the family . . . . It was a little remarkable to me . . . where Connie was not able to identify any way, whatsoever, that she contributed to any of the problems in the family." 1 Verbatim Report of Proceedings (VRP) (Aug. 26, 2019) at 30. Dr. Johnson also explained that he observed the daughters becoming more comfortable with Roger over the period of his examination.

Dr. Johnson also reiterated that he did not find Connie's claims of abuse by Roger to be credible and that "[n]one of the children described what would be considered reportable abuse." 1 VRP (Aug. 26, 2019) at 32. Dr. Johnson admitted that he did not interview the two oldest daughters before publishing his report. He stated that he received a declaration from the eldest

7

daughter that contained sufficient information for his report but that his failure to interview the second daughter was an oversight. However, he interviewed them the Friday before trial. From that conversation, Dr. Johnson concluded that the daughters did not express anything regarding Roger that was consistent with a pattern of abuse. He noted that none of the information he received in his interviews on the Friday before trial changed the conclusions in his report. Dr. Johnson also explained that his recommended parenting plan was designed to improve the children's relationship with both parents and avoid "parental alienation," where children believe one parent is dangerous and unworthy.

Finally, Dr. Johnson testified that although he knew that Roger had left with the triplets for several months beginning in November 2016, he did not have enough information on the event to form an opinion on whether Roger prevented contact between the triplet boys and other family members in a damaging way. He "simply did not pursue the issue." 1 VRP (Aug. 26, 2019) at 68.

B.      *Reunification Counselor: Dr. Dudley's Testimony*

Dr. Dudley, the court-appointed reunification counselor, first met with the parties in December 2017. He focused on improving the relationship between Roger and the daughters. Dr. Dudley testified that during his initial sessions with the family, from December 2017 until June 2018, communication between Roger and the daughters improved. Dr. Dudley observed:

> [F]rom the very get-go there were two prevailing sort of paradigms of what was going on, with [Roger] asserting that this was basically a parental alienation situation, and [Connie] viewing the estrangement between the girls and [Roger] as being a function of him being controlling, emotionally abusive, not listening to them, things of that nature.

1 VRP (Aug. 26, 2019) at 201.

8

Dr. Dudley also reviewed Dr. Johnson's parenting evaluation report. Dr. Dudley stated, "[Dr. Johnson] certainly encapsulated both of [the parents'] perspectives. . . . I'm not endorsing either perspective. . . . My view is that, you know, he covered things." 1 VRP (Aug. 26, 2019) at 202.

Dr. Dudley noted that the adult daughters would go places with the minor daughters without Roger's permission during his residential time.[6] Dr. Dudley testified that the daughters have "issues" with their father, and their perception of his treatment of them, but Dr. Dudley stated that he found neither parent to be obstructive to his therapy. Dr. Dudley explained that the daughters "seem primarily bonded with their mother. . . . I suppose they feel very much aligned with her. They've had a negative view of their dad from when I first met them." 1 VRP (Aug. 26, 2019) at 213.

C.      *Dr. Poppleton's Testimony*

Dr. Poppleton did not prepare a report, reevaluate the relationships, conduct interviews, or do "anything that could lead to a second opinion on the matter." 2 VRP (Aug. 27, 2019) at 254. Dr. Poppleton merely reviewed Dr. Johnson's examination and report and the trial court pleadings. Dr. Poppleton expressed that Dr. Johnson's report contained deficiencies.

Dr. Poppleton criticized Dr. Johnson's report for failing to conduct enough interviews of the children and collateral contacts. He expressed that Dr. Johnson should not have used "alienation" as a lens through which to view the family dynamic because it resulted in bias.

---

[6] Roger also testified that the daughters were not spending all of their designated residential time with him. He testified that the daughters would not show up to his house, that he would not know where they were, and that he felt like the adult daughters had stepped into a parenting role.

9

Regarding physical abuse or other domestic violence, Dr. Poppleton stated that "what's

problematic about Dr. Johnson's study of this is that I can't find any fact. I can't find a single

example of a single incident that was reviewed in any of the file[s] that I received. I would doubt

he even asked the parties about anything that happened." 2 VRP (Aug. 27, 2019) at 274. He

opined that Dr. Johnson did not conduct a thorough examination into any possible allegations of

abuse.

Regarding Dr. Johnson's psychological evaluation of Connie, which concluded there was

"paranoid sensitivity," Dr. Poppleton noted that Dr. Johnson did not complete a causal analysis.

CP at 544. Dr. Poppleton testified:

> [W]ithout a causal analysis of that so you've got here's how they're functioning, what's contributed to that, what is the cause of that, the analysis isn't full.
>
> Now, it might not be domestic violence. It might be personality disorder. It might be something else, right. But if you don't answer that causal question, then your analysis isn't complete.
>
> Q. (By Connie's Counsel) And Dr. Johnson did not address or answer that causal connection?
>
> A. Yeah. . . . It's an essential component to parenting capacity evaluation. You have to have that causal component in there.

2 VRP (Aug. 27, 2019) at 286.

D.      *Trial Court Ruling*

After trial, the trial court made an oral ruling. 5 VRP (Aug. 29, 2019) at 1. The court

first addressed the parenting plan:

> So the court has to consider the statutory factors under which to analyze and try to make order of this mess. And—you know—you're human beings. I think you both made some mistakes along the way.

10

This process of de-coupling as it's been described can be a messy one. It's always easy in hindsight to critique and second guess actions that people have taken.

But here we are today and it's time to put the rubber to the road and to make the necessary determinations.

So the question before the court is to—how to address the issue of the remaining children who are minors and what to do with that in terms of a Parenting Plan.

I'll note that the court quite some time ago ordered a parenting evaluation to be performed by Dr. Kirk Johnson. It took quite some time to do so. In March of this year [2019] Dr. Johnson made his report.

The findings and the recommendations in the report have been discussed at length. [Roger] is generally requesting that the court order a Parenting Plan consistent with those findings and recommendations. [Connie] challenges those and critiques those and asks the court to not apply any of those findings and recommendations in implementing the Parenting Plan.

I listened very carefully to the evidence and the critique of Dr. Johnson's report and I think there's some fair critique to that. It's a very, very difficult task. The court often likes to rely on the expertise of those who are in the business.

The critique of Dr. Johnson's work would be that in reaching his conclusions he failed to do a thorough enough job or ignored—perhaps—certain things that were presented to him.

At the end of the day from a (inaudible) logical standpoint it is a judgment call that an expert and professional does have to make. And some of the critiques are more valid than others of his work.

However it's the very nature of the work that you could always on Monday morning critique the quarterbacking on the football game that took place on Sunday.

. . .

The—the fundamental question though is whether the work that was performed and the analysis and recommendations that were reached are they fundamentally based on something firm enough that this court can and should rely upon.

And it's the determination of this court that Dr. Johnson—who is a credential[ed] and experienced expert in these matters—and again one can always critique that. But at the end of the day the court is going to sustain the findings and recommendations of Dr. Johnson when it comes to the Parenting Plan.

No. 54208-1-II
Consol. No. 54878-0-II

5 VRP (Aug. 29, 2019) at 2-4.

The trial court also explained its decision in terms of "trying to do the best for" the children and their relationships. 5 VRP (Aug. 29, 2019) at 1. The court stated that

> the relationship with both parents is treated as valued from . . . a presumption of equality in these parenting proceedings. It's my sincere hope that whatever ruptures and damage have been done in the relationship with the daughters can be repaired as much as possible. And that also the restoration with the triplet boys—with expanded care and custody with mother—is also in their interest.

5 VRP (Aug. 29, 2019) at 5.

The court then assigned a parenting coordinator (PC). In its order, the court directed the parties to follow all the PC's written instructions. The court noted, "A party's failure to adhere to any of the terms of this order or a PC's recommendation, may be enforceable through the contempt powers of the Court." CP at 678.

The trial court issued its findings and conclusions in October 2019. During the hearing, the court reviewed the parenting plan line-by-line. The court discussed each item in the parenting plan with the parties and made multiple changes to the proposed plan which are reflected in handwritten redactions and addendums throughout the final parenting plan filed by the court. The trial court explained that "[t]he Parenting Plan should be ordered based on the factors set forth in RCW 26.09.181-187 and RCW 26.09.191. The Court considered all statutory factors listed therein." CP at 496.

The court ordered the triplet boys to reside with Roger, spend alternating weekends with Connie, and the daughters were to spend alternate weeks with each parent. Likewise, the parents alternated spring breaks. The parenting plan also placed limitations on Connie under RCW

12

26.09.191. The court placed the limitations because it found Connie had engaged in "[a]busive

use of conflict—Connie Christopher uses conflict in a way that endangers or damages the

psychological development of a child . . . ." CP at 513. The parenting plan read:

> Connie Christopher shall affirmatively direct N[] Christopher, A[] Christopher and L[] Christopher to attend all scheduled residential time with their father. Connie Christopher has the ability to require the daughters to comply with the court's orders. Failure to do so will result in contempt for Connie Christopher. *In re Marriage of Rideout*, 150 Wash. 2d 337, 353 (2003).
>
> Connie Christopher shall not direct any third parties (including adult children) to make parenting decisions, parenting instructions, or approve of the children being somewhere not with the father during his residential time.

CP at 513.

> The parenting plan then required:
>
> Each parent agrees to refrain from words or conduct, and further agrees to discourage other persons from uttering words or engaging in conduct, which would have a tendency to estrange the children from the other parent, to damage the opinion of the children as to the other parent, or which would impair the natural development of the children's love and respect for the other parent.
>
> Neither parent shall encourage the children to change their primary residence or encourage the children to believe it is their choice to do so. This is a choice to be made by the parents or, if they cannot agree, by the courts.

CP at 520. In the same section, the court added a handwritten addendum: "Each parent agrees to

encourage and foster relationships between siblings in the family." CP at 520.

The court also imputed a monthly income to Connie based on minimum wage. The court

found that because Connie had an employment history and because it was "very difficult to get

an accurate figure" on her income therefrom, it would impute a minimum wage income to her,

totaling $2,080 per month. VRP (Oct. 4, 2019) at 26; CP at 488.

13

IV. CONTEMPT PROCEEDINGS

On March 4, 2020, Roger requested to trade his residential time from March 8-15 with Connie for a week in April. On March 6, after receiving no response, Roger asked Connie about a trade again, to which Connie stated she would have to look through the older email messages to determine what he was referring to. On March 7, Connie responded that "[t]he girls would love to be home next week. A 'trade' would not be necessary. They can just be home." CP at 659. She also questioned whether Roger was leaving town and if the triplets potentially would be staying with her.

That same day, Roger responded that he was asking only for a trade for the daughters, not to change the triplets' schedule. He stated that "if the girls do not come to the exchange tomorrow [March 8] at 6 it will be a trade, otherwise we can stay with the usual calendar." CP at 658. There were no further messages between the parties until March 10.

Connie neither delivered the daughters for Roger's residential time nor denied his request.[7] The PC explained in her report: "[Connie] then withheld the girls instead of declining father's request. . . . I advised [Roger] that he is always welcome to make the request and [Connie] could say yes or no, and that if he did travel, he needed to inform [Connie] of his intent." Supp. CP at 752.

---

[7] On March 10, two days after the daughters were scheduled to start their residential time with Roger, Connie wrote Roger that "I did not and do not agree to a trade. I agreed to allow the girls to stay home this week." CP at 657.

14

Additionally, the PC stated that during early 2020, the minor daughters usually left

Roger's care to spend the evenings at their adult sister's house instead of with Roger. The PC

noted:

> When speaking with the girls they are steadfast in their determination to reject father which is also confirmed by Dr. Dudley. They present as a team, most often refusing to talk to father, telling him when they are going to be gone, which is almost all of the time, they refuse to engage or minimally engage with father. N[] is able to drive which allows them total mobility. Also, L[] (11) appears to follow whatever expectations her sisters are dictating with little of her own autonomy.

Supp. CP at 754.

On March 13, Roger filed a motion for contempt hearing against Connie. He stated that

Connie did not obey the parenting plan, which required: "Mother shall affirmatively direct the

children to attend all scheduled residential time with Father and shall not direct any third parties

(including adult children) to make any parenting decisions, instructions, or approval of the

children being somewhere not with Father during his parenting time." CP at 605.

Due to the COVID pandemic, the children's school was closed. This contributed to other

conflicts between the parties involving the children's spring break plans. On March 19, the PC

instructed the parties that

> there will be no spring break and therefore no spring break court ordered residential time. Parents are to honor their regular schedule. For example, every other week, local rule, etc. *do not alter or deviate from this unless you are both in agreement*. . . . A parent cannot decide to unilaterally keep their child(ren) from the other parent during this time unless they are quarantined. . . .

Supp. CP at 753 (emphasis in original). The PC then reported: "However, the girls did not come

to father on [] March 22nd and there should [have been] make up time scheduled for father."

15

Supp. CP at 753. On April 1, the PC informed Connie that Roger had missed two weeks of his parenting time (March 8-15 and March 22-29) and scheduled the make-up dates.

Finally, the PC reported that the daughters "are continuing to spend time with the mother during father's residential time . . . . [Connie] does not foster or support the relationship between [Roger] and children." Supp. CP at 755. On March 30, Roger filed a second motion for contempt hearing that was substantively the same as his March 13 motion.[8] The trial court held a hearing for both contempt motions on April 10.

At the hearing, the trial court explained that it considered "the reports and findings and opinions of the professionals that are involved, both what they say with their expressed terms, as well as inferring and reading between some lines and things, but I'm really concerned about mother's behavior here post-decree." VRP (Apr. 10, 2020) at 22-23. The court stated, "I'm persuaded that under the circumstances of the parenting plan and the coordination and direction of [the PC] that there was contempt here on mother's part. So, I'm going to find her in contempt for violating the parenting plan provisions." VRP (Apr. 10, 2020) at 23.

The trial court made specific findings of fact in the hearing. The court found Connie in contempt for violating the parenting plan by not affirmatively directing the daughters to attend all scheduled residential time with their father. The court found that Connie's actions were contrary to the express wording of the parenting plan order. The court also found contempt because Connie intentionally failed to follow the parenting plan residential schedule.

---

[8] Connie stated that she attempted to drop the daughters off on March 30 for spring break but that "Roger REFUSED to take the girls." CP at 640. But it appears from the record on appeal that because of the spring break cancellation and under the PC's March 19 order, the week of March 30 was Connie's residential week for the daughters.

The trial court also found that Connie failed to follow the "cooperation and respect" provisions of the parenting plan. The court noted that it was disturbed by a declaration filed on Connie's behalf by the 19-year-old daughter, which called Roger's home a "prison." VRP (Apr. 10, 2020) at 21. The court called the declaration "unpleasant" and questioned the appropriateness of a young adult child being "put in a position of saying things about either parent in the context of parenting plan litigation." VRP (Apr. 10, 2020) at 20. The court continued its criticism:

> I'm just wondering if anybody stopped along the way and asked themselves, is this appropriate . . . .
>
> . . .
>
> I wonder . . . either soliciting or accepting or, you know, using a nineteen year old who is very much part of the family constellation in these proceedings . . . did somebody ever tap the brakes on that?

VRP (Apr. 10, 2020) at 20-21. The court stated that it was "looking for the best interest of [the] kids . . . during a worldwide pandemic period." VRP (Apr. 10, 2020) at 26. Therefore, the court explained that it was therefore awarding Roger three weeks of makeup time "in coordination and conjunction with" the PC. VRP (Apr. 10, 2020) at 27.

Finally, the court awarded Roger $2,500 in attorney fees. It explained that it was "persuaded from my recollection of the filed materials" that the "mother's actions have necessitated the litigation of this circumstance." VRP (Apr. 10, 2020) at 29.

Connie appeals the parenting plan, the child support order, the final divorce decree, and the contempt order.

ANALYSIS

Connie argues that the trial court abdicated its responsibility to independently evaluate the facts by adopting Dr. Johnson's recommendations for the parenting plan. She further argues that Dr. Johnson's parenting evaluation was fatally flawed and unreliable. Next, she argues that the trial court erred when in found her in contempt. Connie then argues that the trial court erred when it imputed income to her for the purposes of child support. Each of Connie's arguments fails.[9]

I. PARENTING PLAN

Connie argues that the trial court abused its discretion because it did not follow the law or apply the correct legal standard when it instituted the October 2019 parenting plan. We disagree.

A. *Standard of Review*

The trial court has broad discretion in developing a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The trial court must wield this discretion in the best interest of the children and only after considering the factors identified in RCW 26.09.187(3). *In re Parentage of J.H.*, 112 Wn. App. 486, 492-93, 49 P.3d 154 (2002). RCW 26.09.187(3)(a) provides that "[t]he court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances."

---

[9] Connie also argues that we should remand to a different trial court judge because the trial court here has shown it cannot be neutral. Because we do not remand this case, we do not consider this argument.

We review a trial court's parenting plan for abuse of discretion, which occurs when a decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). We determine whether a trial court's findings of fact are supported by substantial evidence. *In re Marriage of Black*, 188 Wn.2d at 127. We do not reweigh the evidence to determine if we would reach a different conclusion from the trial court. *In re Marriage of McNaught*, 189 Wn. App. 545, 561, 359 P.3d 811 (2015). We are reluctant to disturb child placement decisions "[b]ecause the trial court hears evidence firsthand and has a unique opportunity to observe the witnesses." *In re Parenting & Support of C.T.*, 193 Wn. App. 427, 442, 378 P.3d 183 (2016). The party challenging the parenting plan order "'bears the heavy burden of showing a manifest abuse of discretion'" by the trial court. *In re Marriage of Kim*, 179 Wn. App. 232, 240, 317 P.3d 555 (2014) (quoting *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985)). Thus, "trial court decisions in dissolution actions will be affirmed unless no reasonable judge would have reached the same conclusion." *In re Marriage of Kim*, 179 Wn. App. at 240.

B.      *The Trial Court Did Not Abdicate Its Authority*

Connie argues that the trial court abused its discretion because it "abdicated its responsibility" to evaluate the facts and erred by treating Dr. Johnson's report as a decision to be affirmed, rather than making its own findings. Br. of Appellant at 21. We disagree.

RCW 26.09.220(1)(a) provides that "[t]he court may order an investigation and report concerning parenting arrangements for the child." "The trial court then considers the report and recommendation, along with the parties' comments and criticisms; the court is not bound by the report, but makes its own assessment of the child's best interest." *In re Brown*, 153 Wn.2d 646,

655 n.5, 105 P.3d 991 (2005) (citing *In re Marriage of Swanson*, 88 Wn. App. 128, 138, 944

P.2d 6 (1987)).[10]

In *In re Custody of S.H.B.*, the grandmother appealed the trial court's placement of

S.H.B. with the godmother. 118 Wn. App. at 74. The grandmother challenged the trial court's

reliance on a parenting evaluation, which recommended placement with the godmother, arguing

that the trial court abdicated its responsibility to independently determine findings of fact.

*S.H.B.*, 118 Wn. App. at 74-75, 84-85. The grandmother argued the report was unreliable

because the evaluator did not meet with all of the concerned parties. *S.H.B.*, 118 Wn. App. at

85-86. Division 1 of this court affirmed and upheld the trial court's reliance on the report,

explaining that the trial court's conclusion was made in the child's best interest. *S.H.B.*, 118 Wn.

App. at 88-89, 92.

Regarding the trial court's reliance on the parenting evaluator's report, the *S.H.B.* court

explained that the trial court was authorized to consider such reports:

> [T]he purpose of parenting evaluations is to evaluate the petitioning parties and
> recommend which would provide the most stable, beneficial environment for the
> child. The evaluator considered the emotional and the physical environment of the
> respective households in making her recommendation. Her report was based on
> comprehensive tests, interviews with the parties, and observations about how they
> interacted and reacted to questions.

118 Wn. App. at 86.

---

[10] Although *In re Brown*, 153 Wn.2d at 655, concerned non-parental child placement under
RCW 26.10.130, the language in RCW 26.10.130(1) and RCW 26.09.220(1)(a) is substantively
the same and the "underlying purpose" of both statutes is "to assist the trial court in determining
who is best suited to serve as the primary residential custodian." *In re Custody of S.H.B.*, 118
Wn. App. 71, 84-85, 74 P.3d 674 (2003).

Here, the trial court did not abdicate its responsibility to independently determine findings of fact. The court heard testimony from multiple witnesses, including two experts, Dr. Johnson and Dr. Poppleton. In its lengthy oral findings, the trial court explained that it considered Dr. Johnson's report *and* Dr. Poppleton's criticisms thereof:

> [Roger] is generally requesting that the court order a Parenting Plan consistent with [Dr. Johnson's] findings and recommendations. [Connie] challenges those and critiques those and asks the court to not apply any of those findings and recommendations in implementing the Parenting Plan.
>
> I listened very carefully to the evidence and the critique of Dr. Johnson's report and I think there's some fair critique to that. It's a very, very difficult task. The court often likes to rely on the expertise of those who are in the business.
>
> The critique of Dr. Johnson's work would be that in reaching his conclusions he failed to do a thorough enough job or ignored—perhaps—certain things that were presented to him.
>
> At the end of the day from a (inaudible) logical standpoint it is a judgment call that an expert and professional does have to make. And some of the critiques are more valid than others of his work.

VRP (Aug. 29, 2019) at 2-3.

Thus, the trial court analyzed the testimony and evidence before it and made a decision based on the evidence. It did not abdicate its authority to Dr. Johnson. The trial court did not adopt a parenting plan developed by Dr. Johnson without analysis or fact-finding. Instead, the court made its own determinations, making multiple handwritten redactions and addendums throughout the final parenting plan form. The court also made it clear that the plan was in the best interest of the children.

Like the report filed in *S.H.B.*, Dr. Johnson's report considered the emotional and the physical environment of the respective households. Despite its flaws, Dr. Johnson's report was

based on comprehensive tests, interviews with the parties, and observations. Accordingly, the trial court's consideration and reliance on Dr. Johnson's report was appropriate.

Connie argues that the trial court erred when it stated that "the fundamental question though is whether the work that was performed and the analysis and recommendations that were reached are they fundamentally based on something firm enough that this court can and should rely upon." VRP (Aug. 29, 2019) at 4. She argues that this statement shows that the trial court was focused on whether to adopt Dr. Johnson's findings, and not what was in the best interest of the children or the statutory factors in RCW 26.09.187. But viewing this statement in context, it is clear that the trial court was discussing the reliability of Dr. Johnson's report—as laid out in *S.H.B.*—as the "fundamental question" and not adopting an incorrect legal standard.

The trial court's statement on the "fundamental question" surrounding Dr. Johnson's report followed a lengthy oral analysis of Dr. Poppleton's criticisms of the report. Moreover, the court was clear that it "has to *consider the statutory factors* under which to analyze and try to make order of this mess." VRP (Aug. 29, 2019) at 2 (emphasis added). The court also repeatedly couched its statements in terms of what was "best for" the children and made a decision that was "in their interest." VRP (Aug. 29, 2019) at 1, 5, 23, 26. Thus, the trial court did not adopt an incorrect legal standard when considering Dr. Johnson's report.

Connie relies on *In re Smith-Bartlett*, 95 Wn. App. 633, 635-36, 976 P.2d 173 (1999), where the children were placed based on a parenting plan implemented in mandatory arbitration. There, the trial court confirmed the arbitration decision without a hearing. *Smith-Bartlett*, 95 Wn. App. at 636. Division 3 of this court reversed the trial court's confirmation of the parenting plan, holding that court-mandated arbitration guarantees trial de novo. *Smith-Bartlett*, 95 Wn.

22

App. at 637, 642. But that is not the situation here. Dr. Johnson's report was not the decision of

an arbitrator, but the opinion of a parenting evaluator under RCW 26.09.220. Thus, the report

was a piece of evidence for the trial court to weigh and consider, "along with the parties'

comments and criticisms." *In re Brown*, 153 Wn.2d at 655 n.5. The record on appeal shows that

the trial court did so here. Accordingly, the trial court did not abdicate its authority to Dr.

Johnson or otherwise abuse its discretion by relying on the report.

C.    *The Trial Court Considered the Mandatory Statutory Factors under RCW 26.09.187*

Next, Connie argues that the trial court abused its discretion because it did not consider

the mandatory statutory factors under RCW 26.09.187. We disagree.

As explained above, when establishing a parenting plan, the trial court must consider the

factors enumerated in RCW 26.09.187(3). Following a bench trial, the trial court must enter

written findings of fact and conclusions of law. CR 52(a)(1); *In re Parenting & Support of C.T.*,

193 Wn. App. at 442. Where a trial court's written findings do not clearly reflect the statutory

factors, we may refer to the trial court's oral opinion. *C.T.*, 193 Wn. App. at 443. However,

specific findings are not required on each statutory factor where the record on appeal shows that

evidence of those factors is before the trial court and its oral and written findings reflect

consideration of the statutory elements. *C.T.*, 193 Wn. App. at 443.

Here, the record on appeal shows that the trial court considered the statutory factors.

Evidence of the factors was before the trial court and analysis of each factor was contained in

Dr. Johnson's report. Although the trial court did not make specific findings on each statutory

factor, the record reflects the trial court's consideration of the statutory elements. First, in the

trial court's findings and conclusions regarding the parenting plan, it stated, "The Parenting Plan

should be ordered based on the factors set forth in RCW 26.09.181-187 and RCW 26.09.191. The Court considered all statutory factors listed therein." CP at 496. Then, in its oral ruling, the trial court explained it was analyzing the issues by "consider[ing] the statutory factors." 5 VRP (Aug. 29, 2019) at 2. Thus, Connie's argument that the trial court "made no attempt to address the mandatory factors" is incorrect. Br. of Appellant at 25.

Connie argues that the trial court's statement that "you could always on Monday morning critique the quarterbacking on the football game that took place on Sunday" evinces that the trial court abdicated its role and failed to address the statutory factors. VRP (Aug. 29, 2019) at 3. But this statement is not evidence that the trial court did not consider the factors. Indeed, as explained above, the record on appeal shows that it did. Instead, Connie argues that the wording the court used when describing its analysis is evidence of an abuse of discretion. But pointing to a few idioms the trial court hung its hat on is not enough to show the trial court's decision is manifestly unreasonable or based on untenable grounds or reasons. Here, the record on appeal reflects that it was not.

Connie also appears to argue that the trial court erred because it should have decided that Roger's residential time should have been limited under RCW 26.09.191, which lists potential restrictions in temporary or permanent parenting plans as it relates to abandonment, physical, sexual, or emotional abuse, or other domestic violence. Connie argues that because Dr. Johnson admitted that he did not interview the two oldest daughters before publishing his report, the trial court did not have sufficient information to affirmatively determine that Roger was physically violent. Thus, she argues, the court lacked substantial evidence to make a decision on the .191 factors, which must be considered in completing the parenting plan.

24

However, the record on appeal is replete with evidence to support the trial court's decision not to place .191 restrictions on Roger. In his report, Dr. Johnson concluded that although Connie raised the issue of abuse by Roger, he found no evidence to support her allegations. Dr. Johnson also testified that he did not find Connie's claims of abuse by Roger to be credible and that "[n]one of the children described what would be considered reportable abuse." 1 VRP (Aug. 26, 2019) at 32. Dr. Johnson also stated that, although he failed to interview the two oldest daughters before publishing his report, from an interview before trial he concluded that the daughters did not express anything regarding Roger that was consistent with a pattern of abuse. Furthermore, Dr. Dudley stated that he found neither parent to be obstructive to his reunification therapy. Thus, there was substantial evidence in the record for a reasonable judge to reach the conclusion that .191 restrictions on Roger were not warranted. Accordingly, Connie cannot show that the trial court abused its discretion by not imposing .191 restrictions on Roger.

## II. EXPERT REPORT RELIABILITY

Connie argues that Dr. Johnson's parenting evaluation was so irredeemably flawed that the parenting plan based on his recommendations cannot stand. Because Connie's argument calls for us to reweigh the evidence on appeal, the argument fails.

"We do not review the trial court's credibility determinations or weigh conflicting evidence." *In re Marriage of Black*, 188 Wn.2d at 127. Trial courts have wide latitude in determining the weight to give expert opinions. *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993). We defer to the trial court's determination of the weight and persuasiveness of conflicting expert opinions and we will sustain the trial court's findings if they

are within the range of the expert testimony. *State v. Monaghan*, 166 Wn. App. 521, 534, 270 P.3d 616 (2012), *as amended* Feb. 28. 2012; *see also In re Marriage of Harrington*, 85 Wn. App. 613, 637, 935 P.2d 1357 (1997); *Sedlock*, 69 Wn. App. at 491. Challenges to the reliability or adequacy of an expert opinion generally go to the weight or, in some cases, the admissibility of the opinion.[11]

Here, Connie does not argue that Dr. Johnson's report was inadmissible. Rather, she argues that his report was "irredeemably flawed" and unreliable. Br. of Appellant at 29-40. She bases her argument on Dr. Poppleton's criticisms of Dr. Johnson's report, arguing that the report was incomplete, Dr. Johnson's investigation was deficient, and his scholarly sources and methodology were inadequate. As explained above, however, these arguments go to the weight of Dr. Johnson's opinion. Because we defer to the trial court's assessment of the weight and credibility of Dr. Johnson's report, Connie's challenges to the completeness and scholarly rigor of his report fail.

---

[11] *Cf. Katare*, 175 Wn.2d at 39 (holding that expert's failure to conduct personal evaluation of the subject went to the weight of his testimony, not its admissibility); *State v. Copeland*, 130 Wn.2d 244, 270-77, 922 P.2d 1304 (1996) (whether DNA lab failed to follow standards and controls and whether its studies were valid went to weight of evidence); *State v. Gentry*, 125 Wn.2d 570, 588, 888 P.2d 1105 (1995) ("whether the proper procedures were carried out, whether the lab notes were adequate, whether the number of amplifications conformed to the laboratory protocol, are questions regarding whether this particular test was properly conducted and hence go to the issue of weight, not admissibility."); *State v. Peterson*, 100 Wn.2d 788, 792, 674 P.2d 1251 (1984) ("[a]ny challenge to the reliability of the Breathalyzer reading goes to its weight"); *Colley v. Peacehealth*, 177 Wn. App. 717, 731, 312 P.3d 989 (2013) (expert testimony need not be flawless to be admissible; objections to expert's methods and use of certain data went to weight of his testimony); *City of Bellevue v. Raum*, 171 Wn. App. 124, 154, 286 P.3d 695 (2012) (holding that an expert never physically examining the subject went to weight of expert's testimony); *State v. Leuluaialii*, 118 Wn. App. 780, 788, 77 P.3d 1192 (2003) ("a dispute over the validity of particular procedures generally goes to the weight of the evidence").

### III. CONTEMPT

Connie argues that we should reverse the contempt order because it was based on a flawed parenting plan. She argues that the contempt order was based on her daughters' actions, which she cannot control, not her own actions or lack of action. Connie then argues there is no evidence that she "intentionally" violated the parenting plan. Br. of Appellant at 45. Each of her arguments fails.

### A.    *Legal Principles*

We review a trial court's contempt decision for an abuse of discretion. *In re Marriage of Eklund*, 143 Wn. App. 207, 212, 177 P.3d 189 (2008). A trial court abuses its discretion where it exercises its discretion on untenable grounds for untenable reasons. *Eklund*, 143 Wn. App. at 212. We review factual findings for substantial evidence and do not review credibility determinations on appeal. *Eklund*, 143 Wn. App. at 212 (citing *In re Marriage of Rideout*, 150 Wn.2d 337, 352, 77 P.3d 1174 (2003)). We strictly construe the parenting plan to determine if the alleged conduct constitutes a "'plain violation'" of the plan. *Eklund*, 143 Wn. App. at 212 (quoting *In re Marriage of Humphreys*, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995)).

Here, the parenting plan stated:

Connie Christopher shall affirmatively direct N[] Christopher, A[] Christopher and L[] Christopher to attend all scheduled residential time with their father. Connie Christopher has the ability to require the daughters to comply with the court's orders. Failure to do so will result in contempt for Connie Christopher. *In re Marriage of Rideout*, 150 Wash. 2d 337, 353 (2003).

Connie Christopher shall not direct any third parties (including adult children) to make parenting decisions, parenting instructions, or approve of the children being somewhere not with the father during his residential time.

CP at 513.

The parenting plan then required:

Each parent agrees to refrain from words or conduct, and further agrees to discourage other persons from uttering words or engaging in conduct, which would have a tendency to estrange the children from the other parent, to damage the opinion of the children as to the other parent, or which would impair the natural development of the children's love and respect for the other parent.

Neither parent shall encourage the children to change their primary residence or encourage the children to believe it is their choice to do so. This is a choice to be made by the parents or, if they cannot agree, by the courts.

CP at 520. In the same section, the court added a handwritten addendum: "Each parent agrees to encourage and foster relationships between siblings in the family." CP at 520.

Then, in the order appointing the parenting coordinator, the trial court directed the parties to follow the PC's written instructions. It stated, "A party's failure to adhere to any of the terms of this order or a PC's recommendation, may be enforceable through the contempt powers of the Court." CP at 678.

B.      *The Contempt Order was not Based on a Flawed Parenting Plan*

Connie argues that the contempt order was the "inevitable result of a flawed parenting plan." Br. of Appellant at 40. But as shown in Part II above, the parenting plan was not flawed as a matter of law, and we defer to the trial court's determination of weight given to expert opinion. Additionally, Connie cites *Rainier Nat'l Bank v. McCracken*, 26 Wn. App. 498, 509-10, 615 P.2d 469 (1980), but that case is inapplicable here. That case dealt with a trial court's contempt order arising from fraudulent conveyances where the transferees were fined and jailed for refusing to comply with orders to pay the proceeds received from the fraudulent conveyances and account for the disposition of the contract proceeds. *McCracken*, 26 Wn. App. at 500-501.

The issue there was whether a party who claims title to funds can be summarily compelled to pay the funds to the registry of the court and held in contempt for failure to do so. *McCracken*, 26 Wn. App. at 508. It had nothing to do with contempt orders arising from parenting plan violations. Connie's first argument fails.

C.     *The Daughters' Conduct was not the Basis for the Contempt Order*

Connie next argues that she cannot be held in contempt for her daughters' failure to behave according to Roger's instructions and the parenting plan. Although the record on appeal shows that the eldest of the minor daughters is old enough to drive and would leave with the other girls, Connie was not held in contempt for the daughters' actions. Instead, the court stated it found contempt because Connie violated the parenting plan by not affirmatively directing the daughters to attend all scheduled residential time with their father.

The parenting plan plainly states that "Connie Christopher has the ability to require the daughters to comply with the court's orders." CP at 513. "Connie Christopher shall not direct any third parties (including adult children) to make parenting decisions, parenting instructions, or *approve of the children being somewhere not with the father during his residential time*." CP at 513 (emphasis added). Here, the PC stated that during early 2020, the minor daughters usually left with the eldest minor daughter, who could drive, and spend evenings at the eldest (adult) sister's house during Roger's residential time.[12] The PC also found that the daughters "are

---

[12] Connie also argues that the trial court should not have relied on the PC's report because it is biased and flawed in the same way as Dr. Johnson's report. This calls for us to weigh the PC's credibility. For the reasons explained in Part II, above, we do not make this credibility determination on appeal. *In re Marriage of Black*, 188 Wn.2d at 127.

continuing to spend time with [Connie] during [Roger]'s residential time . . . . [Connie] does not foster or support the relationship between [Roger] and children." Supp. CP at 755.

Connie argues that the PC did not present "any evidence Connie was directing the daughters' behavior." Br. of Appellant at 42. But under the plain language of the parenting plan, the PC need not show Connie was "directing" the daughters, but because "Connie . . . has the ability to require the daughters to comply . . . ." the PC need show only evidence that Connie "approve[d] of the children being somewhere not with the father during his residential time." CP at 513.

Connie then argues that the trial court erred when it relied on *In re Marriage of Rideout*, 150 Wn.2d 337, when it found her in contempt. In *Rideout*, the mother was found in contempt for withholding the child from the father, claiming the child did not want to spend time with the father. 150 Wn.2d at 344-49. Our Supreme Court held that parents have "an obligation to attempt to overcome the child's resistance to the residential time in order to ensure that a child's residential time with the other parent takes place." *Rideout*, 150 Wn.2d at 356. Connie argues that she did this—but the record shows otherwise. As stated above, the daughters continued to spend time with Connie during Roger's residential time. The daughters' repeatedly spending evenings at their adult sister's house during Roger's residential time supports the court's finding that Connie was not affirmatively requiring the children to follow the parenting plan and tacitly "approv[ing] of the children being somewhere not with the father during his residential time." CP at 513, 605.

Thus, substantial evidence in the record supports the trial court's finding that Connie violated the parenting plan by not affirmatively directing the daughters to attend all scheduled

residential time with their father. The court found that Connie's actions were contrary to the express wording of the parenting plan order. Accordingly, Connie's second argument fails.

D.     *Substantial Evidence Supports that Connie Violated the Parenting Plan.*

Last, Connie argues that there is no evidence that she intentionally violated the residential provisions of the parenting plan. We disagree.

As our Supreme Court stated in *Rideout*:

> Parents are deemed to have the ability to comply with orders establishing residential provisions and the burden is on a noncomplying parent to establish by a preponderance of the evidence that he or she lacked the ability to comply with the residential provisions of a court-ordered parenting plan or had a reasonable excuse for noncompliance.

150 Wn.2d at 352-53.

The record on appeal shows that Connie withheld the daughters from Roger's residential time on two separate occasions: once beginning March 8, 2020, when Connie refused to trade residential weeks with Roger but instead allowed the daughters to stay at her home during his residential time, and again beginning March 22 after the school district cancelled spring break. As stated above, nothing in the record shows that Connie attempted to dissuade the daughters from leaving Roger's during his residential time. Indeed, the record on appeal shows that they spent time at Connie's house during his time. Connie makes no showing that she lacked the ability to comply with the parenting plan or had a reasonable excuse for noncompliance.

Similarly, regarding the trial court's finding of contempt under the "cooperation and respect" provisions of the parenting plan, the trial court expressed how the declaration filed on Connie's behalf by the 19-year-old daughter was inappropriate. The daughter called Roger's home a prison and the court called the declaration "unpleasant." This also shows that Connie

31

failed to "discourage" the daughter and tacitly encouraged "damag[ing] the opinion of the children as to the other parent" and did not "encourage and foster relationships between siblings in the family." CP at 520. Thus, for all these reasons, substantial evidence supports the trial court's finding of contempt.

## IV. IMPUTED INCOME

Connie argues that the trial court erred when it imputed income to Connie for the purposes of child support. We disagree.

We review child support orders for a manifest abuse of discretion. *In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 484, 421 P.3d 1046 (2018). When calculating child support, the trial court must account for all income and resources in each household. RCW 26.19.071(1). This includes salaries, wages, and other sources of income. RCW 26.19.071(3). The trial court must impute income to a parent who is "voluntarily unemployed or voluntarily underemployed." RCW 26.19.071(6). Whether a parent is voluntarily unemployed or underemployed is determined "based upon that parent's work history, education, health, and age, or any other relevant factors." Former RCW 26.19.071(6) (2018). "A court shall not impute income to a parent who is gainfully employed on a full-time basis, unless the court finds that the parent is voluntarily underemployed and finds that the parent is purposely underemployed to reduce the parent's child support obligation." Former RCW 26.19.071(6).

Here, the trial court found that Connie had an employment history and that it was "very difficult to get an accurate figure" on Connie's income therefrom, therefore it would impute a minimum wage income to her, totaling $2,080 per month. VRP (Oct. 4, 2019) at 25-26; CP at 488. The record on appeal supports this finding. Roger filed for dissolution in September 2017.

From April to September 2017, the period of time before Roger filed for dissolution, Connie testified that she worked at multiple jobs. But she also testified that her job was "being a mother, [a] full-time job," but that she was not able to work because she was "doing court things." 5 VRP (Aug. 29, 2019) at 816. From this, it is possible to infer that Connie stopped working after Roger filed for dissolution. Therefore, it was within the trial court's discretion to impute income to Connie for being "voluntarily underemployed" for the purposes of RCW 26.19.071.

## ATTORNEY FEES

Roger argues that he should be awarded attorney fees on appeal. He argues that Connie's appeal is "meritless." Br. of Resp't at 42. We decline to award attorney fees.

Although Roger argues that Connie's appeal is meritless, he does not argue that we should award attorney fees under RAP 18.9. Instead, he relies on RCW 26.09.140. In dissolution proceedings, we "may, in [our] discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." RCW 26.09.140. When determining whether to award such fees, we must consider the party's relative need versus the ability to pay. *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 568, 446 P.3d 635 (2019). We also consider the general equity of the fee given the disposition of the marital property and the merit of the issues raised on appeal. *In re Marriage of Davison*, 112 Wn. App. 251, 259-60, 48 P.3d 358 (2002).

Here the record shows that Roger has more income than Connie and was awarded all interest in the family's multiple business holdings. Meanwhile, Connie was imputed minimum wage. Thus, balancing need and ability to pay, we use our discretion and do not award attorney fees on appeal.

No. 54208-1-II
Consol. No. 54878-0-II

CONCLUSION

We hold that the trial court did not abdicate its responsibility or abuse its discretion when it relied on Dr. Johnson's parenting evaluation report. We further hold that the trial court did not err in finding Connie in contempt because the contempt order was supported by substantial evidence. The trial court did not abuse its discretion when it imputed income to Connie for the purposes of child support because the record shows that she had been employed before dissolution during the parties' separation and that she had taken time away from work to focus on the trial. We use our discretion and do not award attorney fees on appeal. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Maxa, J.

Cruser, J.